```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                             NASHVILLE DIVISION

 3


 4    BRIDGESTONE AMERICAS, INC.,    )
                                     )
 5    vs.                            ) No.:  3:13-cv-01196
                                     )
 6    INTERNATIONAL BUSINESS         )
      MACHINES CORPORATION           )
 7                                   )

 8    _____

 9                      TRANSCRIPT OF PROCEEDINGS
      _____
10

      BEFORE:            THE HONORABLE JOE BROWN, MAGISTRATE JUDGE
11
      DATE:              January 20, 2015
12
      TIME:              1:05 P.M.
13

14    _____

15

16

17

18

19

20

21

22

23    _____
      BRIAN V. RATEKIN, RPR, CCR
24    Contract Court Reporter
      837-A U.S. Courthouse
25    Nashville, Tennessee  37203
      Telephone:  615-726-2737
```

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF:   DAVID MCMULLAN, ESQ.
                          Don Barrett, P.A.
 3                        Post Office Box 987
                          Lexington, Mississippi  39095
 4
                          CHARLES F. BARRETT, ESQ.
 5                        Charles Barrett, P.C.
                          6518 Highway 100, Suite 210
 6                        Nashville, Tennessee  37205

 7                        AUBREY B. HARWELL, III, ESQ.
                          Neal & Harwell
 8                        150 Fourth Avenue, N
                          2000 First Union Tower
 9                        Nashville, Tennessee  37219-2498

10   FOR THE DEFENDANT:   ANDREW R. McGAAN, ESQ.
                          CHRISTINE P. PAYNE, ESQ.
11                        Kirkland & Ellis, LLP
                          300 N. LaSalle
12                        Chicago, Illinois  60604

13                        JASON W. CALLEN, ESQ.
                          Walker, Tipps & Malone
14                        2300 One Nashville Place
                          150 Fourth Avenue, N
15                        Nashville, Tennessee  37219-2415

16

17

18

19

20

21

22

23

24

25
```

                              JANUARY 20, 2015

 1

 2          THE COURT:  Okay.  We're here on Bridgestone and IBM

 3   and back on discovery and custodians and a few other matters.

 4   And both of you have sent me plenty of reading material, which I

 5   have read.

 6      So there's two or three different issues in the matter.  My

 7   thought would be, take up the first one, which is IBM's

 8   suggestion that some 283,000 documents for six custodians are

 9   going to produce minimal discovery at a substantial cost and,

10   therefore, shouldn't do it, and then I believe Bridgestone has

11   proposed some alternate proposals.  I did, I guess, a rough

12   calculation.  So for the $123,000 for -- it's 283,000 documents,

13   roughly $2.30 a document, and somewhere between 188 with a

14   maximum, at 95 percent confidential -- confidence, 593

15   documents.

16      So I guess this is kind of IBM's request to do this, so

17   maybe I should hear from IBM first.

18          MR. McGAAN:  Good morning -- or good afternoon, your

19   Honor.  Ed McGaan for IBM.

20          THE COURT:  Yes.

21          MR. McGAAN:  We, as you'll recall, discussed this at

22   some length when we were in front of you for the status

23   conference in December.  Not much has changed, which is why

24   we're back now.

25      But to review the bidding, what we had done was alerted

1    Bridgestone to our finding that as to six custodians who worked

2    on the OTC project, IBM employees who worked on the OTC project

3    that Bridgestone has identified as custodians for purposes of

4    retrieving their email, we had discovered that within the broad

5    discovery period, as set forth in the CMO, their time on the OTC

6    project was much narrower.  So we took a look at that and

7    said, well, wow, we've got -- the way the CMO works, we've got a

8    set of search terms from Bridgestone that get run through the

9    custodians' emails, and every email that contains one of those

10   words pops up.  So as we indicated in our papers we filed,

11   there's some very general, sometimes colorful words that don't

12   in and of themselves have anything to do with the OTC project or

13   the  --

14            THE COURT:  I was going to -- I was going to kind of

15   ask what ass and damn have to do with it, but I'm not sure I

16   want to ask.

17            MR. McGAAN:  Yeah.  We don't know, either.  But the way

18   we got to the search terms is, each side spent a considerable

19   amount of time last spring trying to negotiate sort of a common

20   set of search terms.  And that was difficult, and we ended up

21   sort of calling off those discussions, and we each had a set of

22   search terms.  Bridgestone's was much larger -- it is what it is

23   -- much larger than IBM's, and it contains a number of --

24            THE COURT:  I'm not anxious to revisit the search

25   terms.

1      MR. McGAAN:  Right.  We're not going to go back.

2  That's just how it came about.  So the words, they are what they

3  are.  And we agreed to run them and search them, so that's not

4  really the dispute here at all.

5      But what it means is that emails that have nothing to do

6  with the OTC project or this dispute are swept up in that net,

7  and here we have six custodians who had a minor amount,

8  certainly significantly less than the entire discovery period.

9  Those emails were being searched.

10     So we turned to our technology assistant review vendor, H5,

11  and we said, "Can you take a look at this?  What are we finding?

12  Let's do a random sample of the emails that get swept up well

13  outside of the time these custodians worked on the project."

14  And we added a buffer amount of time.  It wasn't the day they

15  started and the day they left; we put some time on the front and

16  the back of each one and have previously shared that with

17  Bridgestone.  And it's Exhibit 1 in the -- to our submission,

18  the chart with those buffers.

19     And they advised us that a statistically significant sample

20  of the emails outside of that period of time, that is, the time

21  we worked to the project plus the buffer --

22          THE COURT:  They ran 3,000.

23          MR. McGAAN:  3,000 was statistically significant and

24  found that based on their analysis, 99.9 percent of the stuff

25  falling outside of that period would be nonresponsive and

1    irrelevant.

2         So we notified Bridgestone that, "Hey, this is 283,000

3    documents.  This is what the statistical analysis shows."  We

4    handed it up to your Honor the last month when we were here and,

5    of course, provided it earlier to Bridgestone.  $123,000 to do

6    it.

7         We have come this far in the case.  We're not going

8    to -- we're not going to review those.  It makes no sense to

9    spend that kind of money to find essentially nothing.

10   And that was our request.

11        Bridgestone has pushed back, and they object to that and

12   say, "Look, the CMO says what it says.  The discovery period is

13   what it is.  You have to spend the money you have to review

14   regardless."  And so that's some added color to this.

15        And really, by way of justification, we have come this far

16   in the case, we've got at least three examples where the parties

17   have either worked together or, with your Honor's guidance,

18   modified the discovery burdens here to account for exactly this

19   kind of burden.  And we set them out in our papers.

20        And the very first time I think we were in front of your

21   Honor was getting the first CMO entered.  And we had an

22   agreement with Bridgestone that the discovery period would begin

23   in January of 2005.  And we learned shortly before the hearing

24   and talked about it at that hearing early on, that Bridgestone

25   said, "Geez, we started the searching for documents as of

December 1, 2005, not January 2005, and we're able to show that, geez, our agreement was different.  It was January."

And what Mr. Barrett, Don Barrett, who is not here today, told the Court, is, "If we have to go back and redo this and go back to January of '05, it's going to -- it's going to be a burden.  It's going to be a lot of hard work and put a burden on Bridgestone."  So with your Honor's guidance, we set the beginning of the schedule, contrary from the agreement we had with Bridgestone, the discovery search period, at December of '05 to accommodate a burden argument.

We ran into this problem again.  And this is -- this doesn't strike me as unusual.  I don't -- I don't fault Bridgestone for fighting about it, because we have had our arguments in this case in some of these issues.

But the next one to arise was in April of last year.  Your Honor had indicated that to the extent Bridgestone had IBM employee and contractor emails in its possession, both sides should have full access to it, and they should produce them to IBM.

And the facts are that there are 169 IBM workers that worked on this project who had assigned Bridgestone email addresses, bfusa.com.  And that was assigned to them for purposes of working on a project and with Bridgestone communicating with the IBM team about the project.  So -- so Bridgestone has 169 of those in storage.  And we said, "Well, consistent with the

1  magistrate's direction" --

2          THE COURT:  We're down, I think, to 168 now.

3          MR. McGAAN:  Right.  One has been retrieved.  One has

4  been retrieved.  We would like to get them.

5      And what Mr. Barrett communicated with me is, "Well, we took

6  a look at it, and these are in some form of deep storage, and

7  the cost to retrieve them is going to cost $750,000.  And we're

8  not giving them to you unless you pay."

9      We thought about it, went back and forth.  They refined

10 their cost estimate at our request, and I think it's something

11 around 627,000 when the dust settled.  They were going to demand

12 IBM pay to obtain a set of emails that are directly relevant to

13 this case.  They're the emails of 169 IBM employees who worked

14 on the project while they were working on the project.

15     Well, with discussions with Bridgestone, we came to an

16 understanding, I think a shared understanding, that there's no

17 way all 169 of those employees are going to have emails that

18 matter in this case.  I mean, there's a concept of overkill.

19     And -- and they agreed; not everyone is going to matter, not

20 going to be material.  So we struck a bargain that I think makes

21 sense to both sides that said, "Look, if you just leave them in

22 your deep storage, if you're not going to access them, we're not

23 going to get access to them, they can just stay there.  However,

24 if either side decides that one or more of those custodians'

25 email boxes should be dug up, if you will, the costs should be

incurred, because suddenly they matter, for whatever reason.

Bridgestone will do it."   And if it was Bridgestone's impetus,

"We want Joe, Sam, and Larry," they will do it at their own

cost, and they'll share a copy with us.  And by the same token,

if IBM says, "Well, Sally, Jane, and Bill, we need theirs,"

Bridgestone will have to go get them.  But now we'll bear the

costs and both sides will get a copy.

THE COURT:  He who wants it pays for it?

MR. McGAAN:  Right.  So they were confronted with the

situation, not emails like we're discussing here today that to a

99.9 percent rate are nonresponsive and irrelevant, but emails

about the project by the people working on it, housed at

Bridgestone, their initial response before we worked out the

compromise was too expensive to give to you, which is, of

course, contrary to Bridgestone's view of this dispute here

today.

And then the third occasion your Honor will remember well.

We're -- we were deep into preparing and reviewing documents for

production, and Bridgestone announced they were going to move

away from the CMO's requirement of attorney review to

technology-assisted review.  And, of course, we had some

briefing and a hearing with your Honor --

THE COURT:  Yeah.

MR. McGAAN:  -- about that.  And I won't rehearse that

in any detail beyond noting that your Honor had pointed to the

```
1    provisions as Bridgestone had in Rule 26 that -- that direct the
2    Court to manage discovery in a way to make it cost-efficient
3    under the circumstances.  And not only did Bridgestone argue it,
4    your Honor relied on it in saying, "You know what?  Even though
5    they're switching horses in the middle of the stream, this makes
6    sense from an efficiency standpoint, and I'm going to" --
7                THE COURT:  Yeah.
8                MR. McGAAN:  -- "permit it."
9                THE COURT:  And I mentioned that they might -- it
10   wasn't going to be unexpected if IBM made some similar requests.
11               MR. McGAAN:  Sure, and --
12               THE COURT:  Which seems to be an accurate prediction,
13   because you -- exactly what you're doing now.
14               MR. McGAAN:  Yeah.  And we have picked -- we have took
15   up your Honor's invitation and did that.
16        So we have now a track record in this case where
17   modifications have been made to meet the exigencies of
18   efficiency and cost.  And that's exactly where we are today.
19        So the only question, it seems to me, arising out of our
20   request and the discussion we had last December is whether the
21   statistical analysis IBM did or H5 did on behalf of IBM was
22   accurate or reliable in determining that what they're asking IBM
23   to spend, at least $123,000 on this to review 28 --
24               THE COURT:  Let me ask -- let me ask this.
25               MR. McGAAN:  Yeah.
```

1       THE COURT: What Bridgestone asked for and did

2 predictive coding was to use predictive coding to bring up the

3 number of documents that then would be actually reviewed.

4     Now, in this case, I understand what H5 says, that based on

5 their statistical sample, running documents, the most likely

6 result is 188 with a max of 500 plus.

7     Now, what -- what's the cost to actually run -- you've

8 obviously got a model set up you used to analyze 3,000. If you

9 ran that model on all 283,000, what is the cost of that? Is

10 that the cost, what would cost the -- the -- the six

11 figure -- six figures? Because I can certainly understand, if

12 you ran -- if you just ran all the documents, you come up with

13 188, you reviewed them and turned those over, or whatever the

14 number is, that's one thing. I don't have any problem at all

15 with you using predictive coding to run the document. But

16 what's the cost to run the whole thing? Is that the -- is that

17 our 123,000 or --

18       MR. McGAAN: I'm going to defer to my partner,

19 Christine Payne, who knows those details better.

20       THE COURT: Okay.

21       MS. PAYNE: Thank you, your Honor.

22     Related to the way in which the parties use

23 technology-assisted review or TAR, TAR by neither party is being

24 used to draw up documents that are then reviewed; rather, what

25 happens is, we take the gigantic pool of documents that are

1    collected from the client, we apply the search terms that are,

2    you know, memorialized into CMO, and then at that point, for a

3    determination of responsiveness or nonresponsiveness, we submit

4    those search-term-retrieved documents through the TAR process,

5    and then that process indicates which ones are going to be

6    responsive, which ones are going to be nonresponsive, and we

7    would do a production, subject, of course, to quality control

8    measures such as sampling.

9         So the -- the cost of actually running them through the TAR

10   process is what we're talking about here, the 123,000.  And so

11   it's -- it's not $2 per document; it actually would be the

12   opposite.  It would be 45 cents per document.  And that is the

13   cost of what we would pay our vendor, H5, to run the 283,000

14   through its system.  And so basically, it would run the

15   documents and then it would show us the results of the TAR

16   process:  These documents, the set of documents are

17   nonresponsive, and then this set, if any, is what it would be

18   determined to be responsive by that.  We would then put those

19   documents through the quality control process and initiate a

20   production.

21             THE COURT:  Okay.

22             MR. McGAAN:  So when we're talking about the 123,000,

23   that is just the vendor cost for the technology-assisted review

24   program.

25        We would also have attorney time, you know, related to

```
1    quality control, and because the parties have agreed to exchange

2    quality control metrics, we would also have attorney time

3    related to sampling.  So we are not including that in the 123,

4    because it's really hard to say what it would be; that is just

5    what we know our minimum costs would be to pay the vendor to run

6    those documents for responsiveness.

7              THE COURT:  Okay.  All right.

8              MR. McGAAN:  So, your Honor, the final word is,

9    Bridgestone has suggested in their papers that one solution will

10   be we turn the documents over to them wholesale, which we simply

11   can't do.  There's privilege waiver issues that cannot be cured,

12   and there's likely to be some other IBM client confidentiality

13   issues that we would put at risk if we're not free to do that.

14   So it's an unorthodox suggestion, and it just can't work here.

15   We are happy to talk about --

16             THE COURT:  It's worth a try.

17             MR. McGAAN:  So that -- but I just wanted to be clear,

18   we looked at whether the impediments are things we can get over.

19   And the risk of privilege waiver is one in and of itself that we

20   can get by.  So that's why we have asked for, first,

21   Bridgestone's agreement to this, which we have not received,

22   and, not receiving that, the Court's approval.

23             THE COURT:  Okay.  Well, let me -- let me hear from

24   Bridgestone on it.

25        Now, as I understood your suggestion, that they just -- they
```

1  turn the documents over to you and you run -- run the

2  examination at your expense, and they said they -- for a number

3  of reasons they have listed, that that wouldn't work.

4       To a certain extent, I mean, what if I say, "Okay, IBM, go

5  ahead and run it, and you'll pay -- you'll pay -- you'll pay the

6  expense or a portion of the expense of doing it?"  I mean, if

7  you were going to -- if you were willing to run them all

8  yourself at your expense, then, obviously, we get around the

9  problem of the confidentiality and privilege, if IBM runs it,

10  but that you bear some or all of the costs.  I mean, I -- I'm

11  just sort of trying to read kind of the implications of some of

12  the offers and matters to do.

13       So let me hear -- let me hear the -- I mean, we're not

14  talking about as big a figure as we did when we did the first

15  predictive coding, but there's some substantial amount of money.

16  I mean, I guess if you figure you are going to spend 123- or

17  $150,000 to get a couple of hundred documents, that's -- that's

18  a fairly -- that's expensive.  And the fact that the CMO

19  initially that I know you-all worked on long and hard to get has

20  been modified, I am not overly concerned about modifying it.

21  What seemed appropriate and reasonable at the time it was done

22  can certainly be changed.  I mean, otherwise, it is not set in

23  concrete, as far as I'm concerned, if there are good grounds to

24  change it.  And, I'm -- you know, I'm not just changing

25  willy-nilly.  But if there's good grounds to change it and they

1  are arguing in this case on this particular set of a couple of

2  hundred -- almost 300,000 documents, it is more expensive.

3      So let me hear a little bit on that, if you would.

4          MR. McMULLAN:  Yes, your Honor.  May it please the

5  Court, my name is David McMullan, your Honor.  I have not had

6  the opportunity to appear before your Honor previously, and I

7  appreciate the opportunity today.

8          THE COURT:  Okay.

9          MR. McMULLAN:  Your Honor, I will try to be as succinct

10  as possible.  I understand the Court has carefully considered

11  the submissions, and I'll try not to -- to retread that ground.

12      Your Honor, Mr. McGaan only covered half of the

13  consideration.  The Court is correct, Mr. McGaan is correct, IBM

14  has asked for a modification of the case management order.  And

15  as we see it, good cause should be demonstrated to do that.  And

16  cost is one consideration.  That's Component No. 1.

17      But the second component is the countervailing consideration

18  of what prejudice, if any, would be the outcome of that for our

19  case and for our opportunity to conduct the discovery that we

20  have to conduct on the claims that we have made.

21      And as the submission that we provided to the Court

22  indicated, the problem with the arguments that have been made by

23  IBM is, is that they say that "Let's don't put these emails into

24  our TAR process," which Mr. McGaan's correct; the parties have

25  historically gone through many efforts to try to conserve

1    resources and time.  We have modified the case management order,

2    we have done things, like Mr. McGaan indicated, to be efficient,

3    to bank away certain data that was for marginally important

4    witnesses.  However, these witnesses are a bit different.  These

5    are management witnesses.

6        The second thing is, these witnesses not only have important

7    information on the job, the argument being made today is -- by

8    IBM was that the scope of responsiveness is in effect, the scope

9    of time that a person was on the job.

10       That -- that comports with the argument that made it

11   throughout the case, which is, this is a breach of contract

12   case, your Honor.  And that's in their motion.  It's pending

13   before the trial court now.  However, the scope of discovery

14   includes not just the points of the contract, it includes claims

15   that there were representations made about the abilities of IBM

16   to do a job that was highly sophisticated.  There were

17   inducements made.

18       And so going into a deposition, your Honor, with these

19   witnesses with a blind spot as to what they did, what they knew,

20   what they considered before they came on the job puts us in an

21   incredible disadvantage to test the veracity and the legitimacy

22   of the anticipated testimony from these witnesses.

23       So the other part of the equation, your Honor, is prejudice.

24   And our client is very interested and continues to remain open

25   to all ways to efficiently narrow the discovery, to shorten the

1    time frame, to shorten the expenses that we have to incur.

2         In the papers that IBM submitted, they suggested that, you

3    know, we should make them do this work, because it wouldn't cost

4    us anything, and ask for every last single email.  Well, that's

5    not the view that we have taken.  It takes us time, takes us

6    money to review that production, to store that information, so

7    there are mutual costs that we seek to avoid.

8         So the problem here, your Honor, is, is that they seek to

9    segregate and have done so in a way that puts us in a

10   disadvantage to be able to examine these witnesses.  To sit down

11   in a deposition and have no idea what the state of mind or the

12   qualifications or the experience of a witness might have had

13   coming into the project, that's a -- a disadvantage that we

14   should not have to bear.

15        Your Honor, we are cognizant of the concerns of the Court to

16   avoid these additional costs.  But we don't know, as your Honor

17   inquired about, what is involved in -- in doing what IBM seeks

18   to not do.  We don't know, however, what the cost would be to do

19   a limited review of this additional email for privilege only.  I

20   don't think that number has been put before the Court.  As I

21   understand, what I am being told today, is, the 120-some-odd

22   thousand dollars of costs they are talking about is to do a

23   complete review.  IBM's concerned about waiver, in spite of, you

24   know, we've got a claw back and plenty of protections in the

25   existing case management structure --

```
 1          THE COURT:  I'm a little bit-- on the claw back, I

 2   mean, claw back generally is for an inadvertent --

 3          MR. McMULLAN:  Yes, sir.

 4          THE COURT:  -- as I understand it, is inadvertent

 5   production.  I mean, just -- apparently, there is some case law

 6   that says if you just give them a dump, that you can't then come

 7   back and claw it back.  Somebody else can argue it away but not

 8   so much for this case.  And so I think they've got the better of

 9   the argument about just a dump.

10          MR. McMULLAN:  Yes, sir.  Well, if the Court is -- in

11   light of the Court's view of that, we don't know what the cost,

12   true cost would be to do a limited review based on privilege.

13   The process that's in place, as I understand it, would allow for

14   a systematic review of that additional ESI for privilege

15   purposes.  And we don't know, I don't believe, at least,

16   presently what that cost will be, but I would assume that it

17   would be much less than the total cost that's been put before

18   the Court for a complete review.  That would be one thing to

19   consider.

20       And, your Honor, as far as cost shifting, you know, at this

21   point, when the submission papers -- I understand that

22   Mr. McGaan and Ms. Payne indicated that there was offered at the

23   last hearing about shifting costs.  I'm not aware of that.  But

24   we certainly have not put pen to paper about what true costs

25   might be or how to share those.  But certainly, if there's going
```

```
 1   to be a limited privilege review with a different number, the
 2   parties would remain open to negotiation of that issue.  But --
 3            THE COURT:  Okay.  Well, I've got -- maybe I
 4   misunderstood.  I thought there had been by Bridgestone an offer
 5   to take the documents and review them at your cost, which would
 6   have -- I would assume --
 7            MR. McMULLAN:  Yes, your Honor.
 8            THE COURT:  -- you have done this whole thing.
 9            MR. McMULLAN:  That's correct.  I thought your Honor
10   was alluding to a cost shift, for us to pay part of the costs
11   for IBM to prepare those documents.  I may have misunderstood.
12            THE COURT:  Okay.  Maybe I'm misunderstanding the
13   difference between preparing and doing.
14            MR. McMULLAN:  Right.  Well, what I understood that we
15   had taken the position before, your Honor, was, we would, of
16   course, take the burden of taking those documents and reviewing
17   them.  That is our cost.
18            THE COURT:  Okay.
19            MR. McMULLAN:  But if the Court is suggesting that we
20   should pay IBM part of their costs to get these documents
21   together and prepare and produce them, that may be a different
22   matter.  I'm not quite clear about that issue.
23            THE COURT:  Well, I thought it was clear.  I'm now less
24   clear.
25            MR. McMULLAN:  Okay.  Your Honor, I guess the question
```

1  I'm asking is, is whether or not there is some more limited

2  review, a privilege review, that is the main concern that's been

3  expressed that might cost less than $123,000.  I don't know the

4  answer to that question.

5        MS. PAYNE:  I can provide the answer.

6        THE COURT:  Okay.  Please.

7        MS. PAYNE:  So there's two ways in which you could do a

8  privilege review for any set of documents, no matter what the

9  volume is.  You can have lawyers look through them and tag any

10  that might be privileged and then do a privilege lock.

11       THE COURT:  Right.

12       MS. PAYNE:  Or I think what Mr. McGaan is suggesting,

13  and I'm not sure we would be entirely comfortable with this, but

14  it is to say maybe you could use the TAR system to do a

15  privilege review.

16    But the thing about it is with most TAR vendors, with our

17  TAR vendor, and I would suspect with Transfer -- that's

18  Bridgestone's TAR vendor also -- the cost of running documents

19  through a system is on a per-document basis.  And whether you're

20  going to ask the TAR vendor to look for one issue, like

21  privilege, or two issues, like privilege and responsiveness, or

22  50 issues, it's going to be the same thing, because you're

23  paying on a per-document basis.  This is not something that we

24  have ever heard from Bridgestone before about asking for

25  something more limited, but based on my understanding --

```
 1              THE COURT:  From your review --

 2              MS. PAYNE:  -- of the TAR process, I don't think there

 3   would be any cost savings.  I think it's 45 cents per document

 4   no matter how many issues you're asking the TAR system to

 5   identify.

 6              THE COURT:  Well, obviously, it would be a little extra

 7   cost, because running for one thing is -- I would assume,

 8   running one thing and running three, there would be some

 9   incremental costs to get it set up.  But once -- I can certainly

10   understand, once you get it set up and just running the

11   documents through the --

12              MS. PAYNE:  Well, actually --

13              THE COURT:  -- program, that cost is -- is per document

14   for sure.

15              MS. PAYNE:  See, because the parties have already

16   engaged in productions, we already have the system set up to run

17   for responsiveness.  So to the extent that your Honor is kind of

18   saying there might be an incremental cost, where the incremental

19   costs would actually come in if we did, as Mr. McGaan suggested,

20   we went to the TAR vendor and said, "Wait, don't run the system

21   that you have already run.  Instead, what we would like you to

22   do is something different and is based on identification for

23   privilege.  And so now, please, develop a new model that will

24   help us identify those documents."

25         So I -- I mean, based on kind of what I'm hearing today,
```

```
 1   which, again, we haven't discussed this or inquired about it,
 2   but we would have to talk with our vendor, because we would
 3   still be facing the 45-cent-per-document fee, but we also might
 4   be facing kind of just like time costs on an hourly basis to set
 5   up the new model for the privilege.
 6        So I don't think that there's going to be a cost savings to
 7   running a privilege review the way that kind of this is being
 8   described.
 9             THE COURT:  Okay.  All right.
10             MR. McMULLAN:  Your Honor, I wanted to make sure I
11   responded to any questions that you raised in the initial
12   presentation by IBM, but I want to emphasize that the
13   counterbalance to the concerns about cost savings, which we,
14   again, are aware of and appreciate, is the hamstring and the
15   prejudice that we would suffer carrying our burden.  And that's
16   where we are with this, is that we've got witnesses who IBM
17   recognizes are people who have relevant evidence.  The question
18   is screening off and segregating part of their email based upon
19   the notion that the definition of relevance is defined as time
20   on the job.  The H5 analysis is -- I'm not sure I exactly
21   understand what analysis occurred.  H5 says that 3,000 documents
22   is statistically significant.  As the Court recognized, that
23   means there may be 500 documents that are upward limits or at
24   least responsive, but that's all it means.
25   The lawyers for IBM are the ones who decided whether or not a
```

1  document was responsive in that analysis.  And so their

2  definition of responsiveness throughout the case has been time

3  on the job.  And for reasons I have already covered, that's not

4  the scope of discovery in this case.  And we would be left with

5  a hole in the evidence.

6      And these emails, of course, with the time that's involved

7  here, are critically important.  They are remote in time.  And

8  so for a witness to remember all these things is unlikely,

9  No. 1.  We can't conduct much of an examination of those

10  witnesses on those claims.  So that's where -- where we come

11  down, the resulting prejudice, we believe, counterbalances these

12  cost savings.

13          THE COURT:  IBM, in running their analysis, they're

14  just -- they're asking for time limits to be imposed from the

15  general time limits.  I forgot, it looked like three or four

16  months, maybe up to six months before and about six months

17  after.  I think roughly -- wasn't it roughly six months before

18  or after the end and start dates?  I think it was a little bit

19  different, but it seemed like, roughly, you had six months on

20  each end of the time they actually, according to your records,

21  worked on the project.

22      Now, one of the thoughts I had when I was going through all

23  this material yesterday was that it seems to me the relevancy of

24  potential emails that are six months before they started work on

25  the project is pretty minimal.  I just -- that to me is

1    getting -- the chances of something being in there is pretty

2    slim.

3        Now, emails after they left, that to me is -- is different,

4    because, obviously, as this thing went along, problems came up,

5    and one thing led to another, and termination, threats of

6    lawsuits, lawsuits, et cetera.  And I could see that emails

7    afterwards could be potentially much more relevant, because,

8    quite frankly, there could be emails back and forth about trying

9    to correct it or, you know, "Why are you here?"  You know, "Did

10   you see this problem and got any" -- I -- I kind of -- one

11   thought I had was to basically say I -- I can see not going back

12   beyond the cutoff date before they started working on it, but

13   to -- but to not put a cutoff date after the end, because those

14   seem to me most likely to have something that's relevant.

15   I -- and so my thought on -- on that really is to -- is to go

16   that way on the dates.

17       And it seems like, you know, the -- that that might be the

18   way to go.  That's going to -- that should reduce -- I don't

19   know how much that would reduce the number of documents, and

20   there would be -- I know -- I don't remember seeing where I

21   could get a handle on how much that would cut out.  Hopefully,

22   it would cut out some.

23       But it seems to me that in the grand scope of things on this

24   case, that we probably need to go ahead and run the -- the

25   analysis on those that go from the beginning date that IBM's

1   proposed through the -- through the end, through the normal end

2   date, and, you know, let the -- I think just let the

3   costs -- have to go -- to go on that one.  That -- so I believe

4   that's where I'm going to come down on that, unless somebody has

5   got something else on it.

6          MR. McGAAN:  Your Honor, that adds -- if you just did

7   that change to the scope here as you're outlining, that would

8   add 157,000 additional documents, slightly better than half of

9   what we're talking about here.  That would be subject to the

10  same conclusions reached by the H5 statistical sampling, that

11  there's a 99.9 percent chance that none of them are responsive

12  or relevant, which -- which briefly goes to the argument we

13  heard from Bridgestone about a blind spot and prejudice.

14      We, of course, knew that simply asking to review something

15  less than from the entire discovery period as to any custodian

16  wouldn't be met favorably, which is why we did the analysis we

17  did, to which there's been no counter, that Bridgestone has had

18  the write-up from H5 since the middle of December.  And so they

19  can't really come here today and say they don't understand it.

20  They have had it for over a month.

21      And it demonstrates, now that we're here and at issue

22  without contradiction, that 99.9 percent of those documents are

23  irrelevant and nonresponsive.

24      So Bridgestone is incorrect when they take the position, as

25  they have here today, that IBM's view of responsiveness is only

1    when a custodian has worked on the project.  That's not the

2    case, it's not the argument we're making.  To be very clear,

3    again, when you take and do the review that we have agreed to do

4    for all custodians in the case of these six, look at the time

5    they worked on the project plus a buffer on each end, what's

6    left out, among the documents that contained at least one search

7    term from Bridgestone's list, what's left out in this case?

8    283,000 documents.  Are they responsive and are they relevant?

9    The analysis shows almost entirely not.

10        So this is not driven by who worked on the project and when;

11   it's driven by the analysis that asks the question, is

12   Bridgestone prejudiced?  And the answer is no, without

13   refutation.

14        I understand lawyers can argue, "Boy, I would rather have

15   more documents, and it seems it's prejudicing me."  But we have

16   looked at that question, and, again, here's no contradiction to

17   it.

18        But to come back to what your Honor was musing about, what

19   if we just took the time period out to the end of the discovery

20   period, which is the time of the filing of the complaint,

21   October 29th, 2013, that would -- because we have looked at

22   that, you know, how many documents before and after the time

23   period we have proposed here are not included, and that adds

24   157,000 of these almost entirely irrelevant documents.  So

25   that's -- that's where the chips fall.

1    THE COURT:  Yeah.  Well, I mean, we -- we come back --

2 we always come back to what economists like to call the marginal

3 cost.  And, obviously, the marginal cost for the last fraction

4 is always higher than high.  I haven't done the figures on it.

5 It's been 53 years since I was a math -- graduated as a math

6 major.  And our statistical analysis then was pretty primitive.

7 I think it was with slide rules and paper and pencil.

8   And again, I've just -- I have cause about the concern, and

9 I understand that each side on some particular issue wants that

10 last little bit on the hopes that there is that need.

11    MR. McMULLAN:  Your Honor --

12    THE COURT:  Yeah?

13    MR. McMULLAN:  -- on behalf of Bridgestone, your

14 suggestion in a Solomon-like fashion I think makes some sense.

15 Certainly, I think we'd rather have some than nothing at all.

16   If you're inclined to go that direction, your Honor -- and I

17 didn't address this, knowing we would be hamstrung about the

18 state of mind and qualification of a witness coming into the

19 project, your Honor is correct, on the state of mind, comments

20 by personnel as they cycled off of the project are relevant.

21 There are a number of custodians, including these who left the

22 project.  But we believe have responsive email.  And I don't

23 want to leave unaddressed the references to the search terms

24 sometimes including colorful language.  That decision to include

25 that was reflective of our finding that a number of times, as in

1    the real world, people get upset about things, and they use

2    colorful language in their email.  And we found that that might

3    be a strong correlation between that excitement and there might

4    be some relevant evidence about what was going on, so we didn't

5    include those for some gratuitous reason.  It was an effort to

6    try to find --

7              THE COURT:  I'm not assuming that you did, but I must

8    admit, when I looked at it --

9              MR. McMULLAN:  We thought it was a great way to try to

10   get down what might be some really responsive documents in the

11   process, and it did yield some of those on both sides.  But

12   people are people, your Honor, and on that point --

13             THE COURT:  Yeah.  "That's the damn foolest -- foolish

14   idea I've ever heard of."  Or they don't know what -- I've

15   probably said that about some things myself.  Fortunately,

16   I -- I try not to do it in email.

17             MR. McMULLAN:  Yes, sir.  Yes, sir.  Well, we think

18   that perhaps the witnesses in these cases, you know, fired off

19   emails before they thought about it in many instances and am

20   sure it's true of both sides.

21             THE COURT:  When both sides are feeding some of my

22   comments back to me, I tend to think maybe I should have kept my

23   mouth shut.  Or, as Judge Morton said, "Keep your damn mouth

24   shut."

25             MR. McMULLAN:  Yes, your Honor.  I wanted to raise that

1    one issue with you.  Thank you.

2         THE COURT:  Well, I mean, I've got -- I've got to come

3    down to a decision on this, because we've got to move on on it.

4         I think -- I -- I'm going to basically decide that -- and,

5    Robbie, help me make sure I make a note so I can get back to the

6    office and start dictating that I get this right, that I think

7    the -- I think it -- there's enough possibility for those terms

8    that are after that we should go ahead and run documents for

9    after it.  I have to look at IBM's study that shows that

10   the -- the number of documents is going to be, at least in a

11   statistical analysis, fairly small if we reduce it down by not

12   quite half, you know, somewhere in the area of 100 documents up

13   to maybe a maximum of 250.

14       And as I understood it, Bridgestone was -- was willing to do

15   some of the running themselves.  I'm going to basically say that

16   to the extent that they want to run those, I'm going to split

17   the cost on that.  So I'm just going to basically split that

18   50/50, but we're going to run it on out to the -- to the end of

19   the period that's in the CMO for the cutoff date.

20       So I think that's where -- that's where I'm going on that.

21   It's -- you know, it's -- it's kind of seat of the pants in the

22   length the chancellor's put on it, and -- but I've got to come

23   down somewhere, and that's where I'm going to come down.  All

24   right.

25       The next issue, I guess, we've got is, we've got three

1    custodians, as I understand it, that -- and I don't know which

2    one we'll want to take up.  We've got three custodians, that

3    they basically say, "We don't have anything for them" and that

4    Bridgestone, I guess, has not requested any substitute for them.

5    Let me hear about that one.  I think -- is that the best one to

6    take up next?

7            MR. McMULLAN:  Yes, your Honor.  If you perceive that

8    as something we raised, I have no problem with that.  I'll be

9    happy to go first.

10           THE COURT:  Whoever has raised it, I want you-all to go

11   first.

12           MR. McMULLAN:  Yes, sir.  Your Honor, to reorient the

13   Court, as you may recall, in the last hearing in December, the

14   issue was raised about the scope of collection, preservation,

15   and the current status of the responsive ESI for three custodial

16   witnesses that Bridgestone had identified:  Mr. Koyya,

17   Mr. Reeve, and Mr. Roubekas.  And I may be butchering the

18   pronunciation of these names.

19           THE COURT:  Trust me; you won't butcher it any more

20   than I will.

21           MR. McMULLAN:  These gentlemen we identified a number

22   of months ago to IBM folks that we wanted to have on our list of

23   custodians to take a look at what they knew and their emails.

24   As the Court has now been provided information on it, there is a

25   timeline about what happened.  And the emails that were in the

1  possession of IBM have now been, as we understand it -- we have

2  been told they are no longer available.  And that's how we left

3  the last hearing, was, IBM indicated to the Court --

4          THE COURT:  They were going to do a further check, and

5  I understand --

6          MR. McMULLAN:  Yes, sir.

7          THE COURT:  -- I understand that the result is the

8  same.

9          MR. McMULLAN:  That's right.  And I will say the result

10  was, my reading of the response and the letter that's in the

11  submission, is somewhat equivocal; that, you know, we don't know

12  100 percent sure, but we believe we can't locate those

13  documents.  And so -- and in the time between the last hearing

14  and today, we have attempted to get a final answer.  I don't

15  think we have a final answer as to -- the main question, that

16  might moot this is, is that data still on a backup system?  And

17  the letter which we received from IBM is not clear to me, your

18  Honor, that they have exhausted their look at the backup.  If it

19  can be found, if that ESI is available through the backup, then

20  that takes this issue off the table, if we can get that

21  information.

22     So that's the first issue, is, can we get an answer on that?

23  And I'm not clear about that answer.

24          THE COURT:  Maybe the best thing to do is, do we have

25  an answer on that?  Because that might short-circuit it.

1    MR. McGAAN:  Yeah.  We didn't know this was confusing.

2  We don't -- currently, IBM cannot find it on any backup

3  system.  All we meant to say was, if a month from now, two

4  months from now, a year from now, someone says, "Hey, we found

5  something," we will let him know.  But we have done a diligent

6  search that three custodians in issue here, their email and hard

7  drives, as we told Bridgestone, were disposed of under normal

8  IBM practices.

9    THE COURT:  And we're going to get to that -- that will

10  be kind of the last -- hopefully the last song today.

11    MR. McGAAN:  Right.  I'm just sharing with you what was

12  told me, --

13    THE COURT:  No.  I understand.

14    MR. McGAAN:  -- that the emails were disposed of

15  consistent with normal IBM practice.

16    THE COURT:  Right.  The people have been asked

17  specifically themselves, and they say they don't have

18  anything --

19    MR. McGAAN:  We looked originally, when this issue came

20  up, for backup systems, other storage that could be -- we

21  couldn't find anything.  Your Honor asked us, when this issue

22  was discussed in the middle of last month, to go take another

23  look.  We did.  We still can't find anything, have no basis to

24  believe that they're residing in some deep vault somewhere or

25  disaster recovery system.

1    So this is the -- stranger things have happened.  If

2    somebody finds something a month from now, of course, we're

3    going to the Court and going to tell Bridgestone.  But that's

4    where we are at right now.  So that's all we know, not to be

5    equivocal about it.

6              THE COURT:  No.

7              MR. McMULLAN:  Thank you, your Honor.

8    In light of that, the issue is fairly preserved critically

9    important evidence as far as we're concerned, relevant evidence

10   at minimal.

11       The submission by IBM suggests that we have, you know, not

12   -- not attempted to push this issue forward.  That is not

13   correct.  What we have attempted to do is gather foundational

14   facts relating to what happened.  That was one question, is, is

15   it on backup?  I hear the answer to that question.

16       The other question was, the response was, some of the

17   relevant ESI was kept for a period of time, and then it was

18   disposed of per, as Mr. McGaan indicated, the normal retention

19   policies of IBM.  Well, because that's a relevant, therefore,

20   relevant question, we asked that question.  We were told, "You

21   don't need to have an answer to that question."  We asked for a

22   copy of the policy.  We were told, "Okay.  Well, we'll give you

23   ours if you give us yours."  That seems a bit disingenuous,

24   but, nevertheless -- because we don't have an issue of missing

25   data at this point.  Nevertheless, we asked for that

1    information.  We didn't get it.

2        But as we stand here today, we want to make sure the Court

3    understands, No. 1, that we're not waiving any right to name

4    additional custodians.  But the suggestion that --

5            THE COURT:  Well, I guess part of the problem, if

6    you're going to -- I mean, if they're now saying, "Those guys --

7    those three guys don't have anything, they can't find anything,

8    we don't" --

9            MR. McMULLAN:  Yes, sir.

10           THE COURT:  -- "expect to find anything.  If somehow

11   lightning struck, we'll let you know quickly, but we have

12   exhausted our present ability to find anything," and maybe then

13   you-all should have the right to name some custodians, rather

14   than to delay things, go ahead and name --

15           MR. McMULLAN:  Yes, sir.

16           THE COURT:  -- three additional people.  Now, I am kind

17   of a view of, if it isn't there, because regardless of the

18   retention policy, if you think there's three additional people

19   that you can -- they admit you have a right to name, to go ahead

20   and get them named so we can start on them.

21           MR. McMULLAN:  Yes, sir.

22           THE COURT:  So I tend to agree with them on that.

23           MR. McMULLAN:  Yes, sir.

24           THE COURT:  Now, on the retention policy, yeah,

25   I -- I'm not into a tit for tat.  I think there is -- I will

1    show you mine if you will show me yours, I am not going there.

2    The issue is with their retention policy.

3        And my initial thought is -- and, obviously, I'm going to

4    hear from IBM -- is that we've got an issue that some people

5    that were on the project and off the project and before the

6    lawsuit was filed, the normal retention policy, we -- we have

7    pitched their stuff, is that whether or not that policy is

8    reasonable or not, I think, to me, is something that has to be

9    explored, and to do that, you probably do need to look at the

10   retention policy as it applies to those individuals.  So I'm

11   kind of -- I'm leaning towards saying that one is, you ought to

12   go ahead and name, if you want to, three additional custodians

13   to substitute, and then we'll have to take a look at what their

14   retention policy is to see if there's -- you know, if it's a

15   normal retention policy, then so be it.  If it's a policy that

16   they should have been retained and they didn't, then that leads

17   us down to a whole 'nother area of sanctions.  And I'll have to

18   go back and read Zublake, 1 through 6 of -- or some part of

19   Zublake, which I don't, frankly, see, you know, intentional.  So

20   far I don't see any indication of intentional.  But, you know,

21   again, the consequences for a nonroutine destruction can be from

22   mild to drastic.

23       So I am -- but I do think we're going to have to go there.

24   But I want, before I make that final cut, I want to -- I want to

25   be sure I hear from IBM.

1        MR. McMULLAN:  Yes, sir.

2        THE COURT:  Okay.

3        MR. McGAAN:  Thank you, your Honor.

4     With respect to the document retention policy story, there's

5   no tit for tat here.  I want to be clear about --

6        THE COURT:  It came across that way.

7        MR. McGAAN:  Of course.  And I see the look in your

8   eye.  But let me tell you a little history that's not really

9   coming out here.

10       THE COURT:  Okay.  All right.

11       MR. McGAAN:  IBM asked Bridgestone initially for its

12  document retention policies last April.

13       THE COURT:  Okay.

14       MR. McGAAN:  Almost a year ago.  Why?  Because when we

15  asked IBM, consistent with the -- Bridgestone, when we asked

16  Bridgestone, consistent with your Honor's directive, to produce

17  the entirety of the emails, the 169 IBM workers who had emails

18  on the Bridgestone server, they said they had, we said, "Give

19  them to us."  That's what your Honor indicated.  We asked for

20  them.  And that's when they said, "It's going to cost -- we're

21  not giving them to you unless you write us a check for

22  three-quarters of a million dollars."

23     We said, "Could we see your document retention policy so we

24  can see the rules you followed that put those emails so out of

25  reach and inaccessible that now it's going to cost us

three-quarters of a million dollars just for the right to see
them?"  Bridgestone said no.

So we, instead, pursued a compromise that I described
earlier.  As we said in our papers, we would be happy to produce
document retention policies, but we have an outstanding request
at Bridgestone to examine their document retention policies from
a year ago so we can find out when and why they took the email
from IBM workers and made it largely inaccessible to IBM in this
case, and we were told no.

Now, your Honor, I have litigated many cases where the
parties have agreed to focus on the merits and not spend their
time doing this and examine document retention policies and make
the litigation about that.  And we thought that's what
Bridgestone's position was.  Why go there?  We're not giving
them to you.  Said fine, we can live with that.

Now that it behooves Bridgestone to see it, they stand here
and say we -- they should get it, but they still don't have to
turn theirs over to us.

We don't object to giving it to them, but, your Honor, they
ought to give us theirs so we can look at the terms and
circumstances under which they took IBM email in their
possession and made it inaccessible.

THE COURT:  Now you're coming back to an issue that,
frankly, in reading through this material, I didn't, frankly,
focus on, because Bridgestone was making the argument that they

1   didn't have any particular issues about theirs. And, frankly, I

2   kind of, in reading through this, I got to where to the -- that

3   there wasn't any issue. But you're right, you have circled back

4   to the issue that came up over the shared email servers at

5   Bridgestone, and we've got the issue now of very substantial

6   cost to retrieve those from -- I forget what the term you-all

7   used, vault, something vault.

8      And that -- that is -- that is -- that is a point that's

9   apart from a tit for tat. If you were just tit for tat, I would

10   cut that off real quick.

11      It does seem to me that, addressing the one half of the

12   equation right now, that the retention policy should be provided

13   for these three employees, that they're no longer there, just to

14   show that it was in the normal routine business. And so I think

15   that -- I don't know how long the retention policy is, and I

16   don't want to get off into the weeds of the retention policy,

17   but that portion of the retention policy that deals with --

18   that's been used to say that "This is why we in a routine matter

19   disposed of these three records; they're not available," I

20   think that part of it needs to be turned over. And that's going

21   to then lead us back to the issue that you-all addressed kind of

22   here toward the end about the vault-type thing.

23         MR. McGAAN: They call it Enterprise Vault.

24         THE COURT: Enterprise. Okay. I couldn't remember the

25   Enterprise. Somewhat like the starship. Okay. The Enterprise

1   Vault, because there, we've got a substantial amount of money.

2   I think we're down to $627,000, roughly, for 168 records.  And

3   to what extent -- now, there, Bridgestone is saying that that --

4   if I understand it correctly, is saying that those emails were

5   no longer available because of their retention policy, and to

6   retrieve them from deep -- from Enterprise Vaults or deep

7   storage, you -- it's going to be a very substantial cost.  And

8   you-all have kind of got a little bit of a deal there.

9       So the question is, do I really need to -- to evaluate that?

10  You-all have kind of got something that's worked out, and you

11  haven't really pushed that much.  Is that an egg I need to try

12  to crack today or is that something I can kick down the road a

13  little bit?

14          MR. McGAAN:  Yes.  And I'll tell you why.  And I think

15  that we have not pushed it, because we did cut a deal with

16  Bridgestone on how to handle it in the wake of their informing

17  us of the cost and refusal to produce and their telling us they

18  wouldn't share document retention policies.  And we thought that

19  would go both ways.  Now, that's changed.

20      But here is an important part, your Honor.  If Bridgestone

21  is going to examine, as your Honor is inclined to let them do --

22  and we certainly made the offer many times to Bridgestone,

23  previously and in our papers here, to exchange these things --

24  they're going to examine IBM's compliance with document

25  retention policy to set up a sanctions motion, we're entitled to

1  see when they put these IBM emails out of reach for normal

2  discovery purposes and to look at their practices in connection

3  with when they believe litigation was reasonably likely and when

4  they made the decision, consistent or inconsistent with their

5  document retention policy, to put information out of order.

6  This should not be a fight where we're forced to fight with one

7  hand behind our back.  We have grounds for it.  And I was

8  perfectly prepared, didn't push it with your Honor, because

9  Bridgestone said they wouldn't produce document retention

10  policies, and, therefore, neither party produced them, and we

11  moved forward and exchanged documents that had to do with the

12  case.

13      Now they have developed a reason to want to see ours.  And I

14  think it's fundamentally fair to say that because we had dealt

15  with this in a different way last April, now we can't look at

16  theirs and examine the very same question, which is whether they

17  put evidence relevant to this case out of reach as a practical

18  matter, and, in particular, to see if they're going to argue, as

19  your Honor suggested, they might be entitled to, was IBM

20  complying or not complying with its document retention policies?

21  We would like to see whether, for example, decisions to take IBM

22  email and put them into a nearly irretrievable place was made in

23  conjunction with decisions about the litigation.  And it's been

24  perfectly clear before, but --

25              THE COURT:  If they were to a point where they were

contemplating litigation, you would think it would be prudent to
have -- and knowing that these emails are -- about this whole
project are in an email database, not to put that into -- into
deep -- deep storage.  On the other hand, if it got done before
they realized that they had potential problems in litigation, I
think you have raised something that, frankly, I would have just
have been happier to have left alone, but I think I have to
address it.

     And, right now, the parties haven't been pushing these 168
that are there, and it may be that -- that most of them won't be
pushed.  But to the extent we get into it and then I have to
start looking at where the cost of that goes, that brings the
issue up.  And it would seem to me, if we go there, it would be
relevant for Bridgestone to -- to provide its retention policy
concerning those emails.

     Now, I don't want to get into broader retention policies.
It will be focused, just as IBM's would be focused, on
these -- as it applies to these three employees, it would be
their retention policy that applies to this email -- this big
email account that was jointly used.

     But I think if we go there, that I -- I will direct that
that be provided.  And it may be you're telling me that on at
least some of those, we're going to be going there and might as
well go ahead and, while we have got the policies out, go ahead
and just say we're going to go there, and so let's go ahead and

```
 1    get it out.
 2          MR. McGAAN:  That's right.  And I want to be very
 3    clear, your Honor, there is no assurance, there is no assurance
 4    whatsoever, because we don't know enough yet, there would be any
 5    sanctions motion over this.  That is the last resort.
 6          THE COURT:  And I can tell you -- I can tell you,
 7    I'm -- and unless I'm convinced somebody is just deliberately
 8    doing something, I'm not a big fan to impose sanctions on either
 9    side willy-nilly.  If somebody -- you know, if somebody -- I
10    think somebody is just flat --
11          MR. McMULLAN:  Your Honor --
12          THE COURT:  -- flat taking advantage of it, I don't
13    mind dropping something.  But I -- you know, I -- there's a lot
14    of things that, you know, in hindsight could have been
15    different, but it's not sanctioned by either side.  And, quite
16    frankly, I'm -- you know, I'm very impressed with the quality of
17    lawyering that's being done on both sides of this case.
18          MR. McMULLAN:  Yes, your Honor.  May I address the
19    Court?
20          THE COURT:  Yes.
21          MR. McGAAN:  Let me finish.
22          MR. McMULLAN:  I'm sorry; you go ahead.
23          MR. McGAAN:  I didn't mean to -- I just wanted to
24    finish --
25          MR. McMULLAN:  I'm sorry.
```

1      MR. McGAAN:  -- the assurance I was making to the

2  Court.

3      I cannot recall -- I'm sure I have done it; I can't recall

4  litigating a sanction motion, either defending one or

5  prosecuting one.  I have somewhere, but that is not where we are

6  going, so --

7      THE COURT:  Yeah.

8      MR. McGAAN:  But what we do need to know, because we

9  cut a deal in good faith about sharing the costs for retrieving

10  these emails, and we reached an agreement with Bridgestone that

11  I don't think anyone has changed their mind on, is almost a

12  lock-dead certainty that lots of these 169 IBM employees aren't

13  material or matter to this case.  No one is going to want

14  unneeded expense or time.

15      But right now I'm confronted with the ones that we may

16  regard as significant for whatever reason, and if I want them,

17  my client has to pay the cost.  And I reached that agreement

18  without looking at whether they ended up in that position

19  consistent with a document retention policy of Bridgestone's or

20  if there even is a document retention policy that governs the

21  decision and when it happened.  All right?

22      And so we cut that deal.  Shame on me for going down that

23  road and finding a way to avoid standing here arguing about

24  something that's, I think, distasteful for most lawyers, heading

25  toward sanctions and stuff, but now we are confronted with it.

1    Now, when the CMO is triggered in a way that everybody
2    understood it could be, we negotiated at the beginning there may
3    be some custodians that there are no emails around anymore, and
4    the remedy was, you get to provide replacement custodians.  And
5    Bridgestone said, "Well, I need more.  I've got to see the
6    document retention policies."

7        And your Honor has indicated a predilection to let them have
8    it as it governs these employees.  We're prepared to turn them
9    over, if that's your Honor's directive.  But I shouldn't have to
10   give up the opportunity to go revisit this deal by seeing, as I
11   have said before, whether they have a document retention policy
12   that led them to put these emails in the enterprise.

13           THE COURT:  Let me be clear.

14           MR. McGAAN:  So --

15           THE COURT:  Let me be clear on something.  If I thought
16   it was just simply a tit for tat, I would cut you off.  I
17   understand where you're coming from on the email storages, that
18   Bridgestone thing.  And I think that is a legitimate question.
19   I don't think that's tit for tat.  I think you have raised an
20   issue there that -- that we're going to have to get into that on
21   a few of those.  And my having gone back and recycled some of my
22   memory cells and -- as to where we are on that, I can see where
23   that you have a not yet tit for tat but a reasonable request for
24   why you would be interested in that portion of Bridgestone's
25   retention policy.  And I'm -- I'm giving that some favorable

```
1    thought right now.  But I want to hear from Bridgestone why,
2    knowing that we're going to have some issues about the cost of
3    that.  And, you know, if we have just one or two, the cost,
4    frankly, is not astronomical.  If we got 100 or -- 100 out of
5    these or 150, then we're talking about real money.  And so then
6    how -- whether or not the sharing of costs for retrieving that
7    should be shifted one way or the other, I would need to -- I
8    would think I would -- it would need to be argued as to the
9    retention policy on the emails, because, quite frankly, it would
10   seem fairly early in the process that -- because Bridgestone was
11   saying this thing wasn't working, it would seem like it would
12   have been fairly early in the process that Bridgestone would
13   have said, "But we'd better hang on to these emails."  But I,
14   you know, I can be totally wrong on this.  So that's why the
15   retention policy, I think, is becoming more and more relevant,
16   in my mind.
17       So let me hear from Bridgestone on what the problem is and
18   letting them know what your retention policy is regarding these
19   emails.  That's the only issue that I see -- I'm not interested
20   in your retention policy on anything else, because I don't see
21   a -- there's no issue that I'm aware of yet.
22           MR. McMULLAN:  Yes, sir.  And I cannot speak to all of
23   the particulars of the discussions Mr. McGaan may have had at
24   that point in time, and I will be happy to go back and obtain
25   that information in follow-up with your Honor about what
```

transpired that gave rise to the mutual agreement as Mr. McGaan
described, that the parties under those circumstances reached an
agreement to leave that data in a place where the costs of
retrieval were deemed to be mutually unacceptable. They're not
beyond reach, however. That's in contrast to what we're talking
about here. And as much as Mr. McGaan says that this is not --
the response today is not retaliatory, it can't help but be
viewed that way when this issue has not been raised before
today. And we certainly are going to be prepared to answer any
question the Court has about retention and the details of how
that data became put in those vaults. It does not remain beyond
reach.

However, there's also a contrast to that mutual agreement to
leave that data alone. Mr. McGaan described those were not
necessarily critical witnesses. The parties agreed that
overkill was not going to be on the order of the day. That's in
contrast to the three witnesses we're talking about here who we
named as custodians.

And to address Mr. McGaan's comment, we have taken the
approach on this issue very delicately. I share Mr. McGaan's
concerns. I have never had an occasion to come before a court
and raise an issue about whether the lawyer or client on the
other side of a case failed to retain critical evidence, and
that's why we have moved on this very carefully, your Honor, and
we would not move prematurely. We asked for fundamental

background information in order to assess the question and
determine whether there was an issue, and that's our obligation
to the Court along the way. And we have been very careful in
how we approached this issue.

So to answer your Honor's question, we would be happy to
provide the retention policy that applies to the issues related
to the 168. We were not here today to talk about that, as far
as we knew, but I understand the Court's articulated concern,
and we will provide information the Court needs.

THE COURT: Okay.

MR. McMULLAN: But we think it's -- the question is,
you know, where do we go from here? And so I think I understand
the Court's view. The retention policies are relevant, and I
understand the Court's view of that.

THE COURT: Okay. Well, with that agreement, then,
that -- as far as I'm concerned, on the retention, you're going
to provide the retention policy from your side on the 168,
they're going to provide their retention policy as to these
three custodians, and I'm going to so rule.

Now, my concern is that, you know, to the extent Bridgestone
can with reasonable speed go ahead and designate three
additional custodians, at some point, it's going to get too late
to designate more custodians. So if you've got some, my
suggestion would be, you know, when you get -- you don't wait
too long. I don't know that I want to set a 15-, 14-, 30-day

1  limit, but I think if you're going to -- if you think you need

2  some more, you need to do it in a reasonable time.

3      Now, on what's going to be --

4          MR. McMULLAN:  Yes, sir.

5          THE COURT:  -- being sought on these 168, again, I

6  don't think that, you know, I can do much more than where we

7  are.  You-all have got an agreement right now that seems to me

8  to be reasonable under the circumstances.  And unless

9  circumstances change and somebody wants to bring that back up,

10 I'm just going to leave that alone until I get a specific thing

11 that when they have asked for ones that are unreasonable, and

12 that's getting unfair, so we need to revisit this, or Judge, you

13 know, this should have been restored.  So I'm going to leave

14 that alone.  I can't -- there's too many moving parts for me to

15 try to stick my paw in it at this point without getting my own

16 hand pinched.  So I'm going to stay out of that one until

17 -- it -- it is a sharp thing.

18     Now, what does that leave us to discuss today?

19         MR. McGAAN:  We just have -- on the last issue your

20 Honor was addressing, on when we should get the additional

21 replacement custodians, I would suggest, under the current CMO,

22 February 19 is the last day to -- we have a rollout scheduled

23 for additional custodians.  These three replacement are --

24 custodians are part of that.  But February --

25         THE COURT:  We're about four weeks away from that.

```
 1          MR. McGAAN:  I might suggest that as an outer limit, if
 2   that's agreeable to Bridgestone.
 3          THE COURT:  If that's in the CMO, then that --
 4          MR. McMULLAN:  Yes, sir.
 5          THE COURT:  Yeah.  I mean, if it goes past the deadline
 6   of the CMO, that's -- unless I have changed it, we'll stick with
 7   that.
 8          MR. McMULLAN:  Yes, sir, February 9.  We'll designate
 9   well before then.
10          THE COURT:  Okay.  Could have been -- you know, if you
11   wait right to the last day, then, you know -- again, I want to
12   try to push things forward as fast as I can, given the size of
13   this case.
14          MR. McMULLAN:  Yes, your Honor.
15          MR. McGAAN:  Right.  So the sooner we get them, the
16   sooner we turn to finding, producing the documents, and --
17          THE COURT:  Right.
18          MR. McGAAN:  -- and when it comes to the depositions of
19   the custodians, the time to get that done is triggered by when
20   they are identified and when their production occurs before you
21   can start to notice them, so it just helps move it along.
22          MR. McMULLAN:  Yes, your Honor.  Thank you, your Honor.
23          THE COURT:  Sounds like you're in agreement with that.
24   All right?  Going once?
25          MR. McGAAN:  We don't have anything else, your Honor.
```

```
1          THE COURT:  Going once --

2      MR. McMULLAN:  I believe that's all, your Honor.

3          THE COURT:  -- going twice, sold American.

4      MR. McGAAN:  Thank you, your Honor.

5          THE COURT:  We're in recess.

6              (Proceedings concluded at 2:13 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>REPORTER'S CERTIFICATE</u>

I, Brian V. Ratekin, Notary Public for the State of Tennessee and Court Reporter, do hereby certify:

That I reported on the stenograph machine the proceedings held in open court on January 20, 2015; in the matter of Bridgestone Americas, Inc., v. International Business Machines Corporation, Case No. 3:13-cv-01196; that said proceedings in connection with the trial were reduced to typewritten form by me; and that the foregoing transcript is a true and accurate record of said proceedings.

This the 24th day of January, 2015.




<u>S/ Brian V. Ratekin</u>

BRIAN V. RATEKIN
Registered Professional Reporter
Certified Court Reporter