UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


BRIDGESTONE AMERICAS, INC.     )
                               )
VS                             )    No. 3:13-1196
                               )
INTERNATIONAL BUSINESS         )
MACHINES CORPORATION           )
_____




BEFORE THE HONORABLE JOE B. BROWN, MAGISTRATE JUDGE

**TRANSCRIPT OF ELECTRONIC RECORDING**

February 4, 2015

_____









_____
PREPARED FROM **ELECTRONIC RECORDING** BY:

**Roxann Harkins, RPR, CRR**
Official Court Reporter
801 Broadway, Suite A837
Nashville, TN 37203
615.403.8314.
roxann_harkins@tnmd.uscourts.gov

1    **APPEARANCES:**

2    For the Plaintiff:        DAVID McMULLAN
                               DON BARRETT
3                             Barrett Law Group
                               404 Court Square North
4                             Lexington, MS 39095

5                             MARK C. WOODS
                               Daniel, Coker, Horton & Bell
6                             4400 Old Canton Rd, Ste 400
                               Jackson, MS 39211
7
                               AUBREY B. HARWELL, JR.
8                             Neal & Harwell
                               150 Fourth Avenue N, Ste 2000
9                             Nashville, TN 37219

10

11

12   For the Defendant:        ANDREW R. MCGANN
                               CHRISTINE P. PAYNE
13                            Kirkland & Ellis
                               300 N. LaSalle
14                            Chicago, IL 60654

15

16

17

18

19

20

21

22

23

24

25

1

2          The above-styled cause came to be heard

3    on February 4, 2015, before the Hon. Joe B. Brown,

4    Magistrate Judge, when the following proceedings were

5    had to-wit:

6              **TRANSCRIPT OF ELECTRONIC RECORDING**

7                        **\*\*\***

8          THE COURT:  We'll start on this first

9    motion, which these are the documents that were 731

10   documents in two folders delivered as part of

11   1.6 million in error.  So that's the first one we'll

12   take up.  Y'all seem to have a bit of an argument over

13   how to get -- how to -- how to unscramble this

14   little -- or how to put this eggshell back together.

15   Go ahead and shoot.

16          MR. McMULLAN:  Yes, Your Honor.  May it

17   please the Court, David McMullan for Bridgestone.  The

18   issue, as we described in our submission is, in fact,

19   an inadvertent disclosure of what amounts to be a

20   virtual Redweld folder.  That's the best way I think I

21   can describe it.  Imagine, if you will, a red brick

22   folder that was on the shelf of one of Bridgestone's

23   primary contacts on the case, which contained, as I

24   indicated in our submission, two types of documents.

25   One of the sets of documents, the first category are

1    documents which had been selected by counsel, by

2    Bridgestone selecting at directional counsel documents

3    which were and are otherwise responsive, but they do

4    reflect work product in the sense that they are, in

5    essence, hot documents that we asked our contact at

6    Bridgestone to collect.

7              And so it really represents sort of a

8    subcategory of work product like we have on the

9    shelves at our own law office.

10             The second category in the folder is, in

11   fact, one product that was created by Bridgestone

12   witnesses at our direction in anticipation of and

13   during the course of litigation and is pure work

14   product in the sense that it's not a document that was

15   part of the transaction, part of the communications

16   between the parties during the course of the

17   relationship, but yet it is, in fact, work product

18   created by Bridgestone and by us, which is pure work

19   product.

20             The documents were -- we don't know

21   exactly how it happened.  We know that the documents

22   in this folder were produced inadvertently.  And when

23   we learned of the disclosure, we contacted IBM counsel

24   and informed them of this inadvertent disclosure.  And

25   we followed the protocol in the agreed protective

1    order.  As the parties anticipated, there were so many

2    documents with millions of documents, on both sides of

3    the case, to be examined and collected, the parties

4    under the agreed protective order anticipated this

5    very possibility and agreed on a procedure.

6            So when we got word to IBM about this

7    issue, we followed the procedures of the agreed

8    protective order and identified the documents.  We

9    explained to IBM that they'd been collected in this

10   folder in a work product manner, and we identified

11   them as best we could without identifying them with

12   specificity to a point where they could infer what we

13   were talking about otherwise.

14           We also explained in the log we provided

15   that there was a difference between a Category 1 or

16   Category A versus Category 2 or B; that some were, in

17   fact, selected or selected by counsel which clearly

18   reflect the impressions of counsel.  In the second

19   category more pure work product.

20           In response, the initial response we got,

21   Your Honor, we indicated in our submission is IBM took

22   the position because of the number of documents in the

23   folder, this couldn't be inadvertent.  We worked

24   through past that initial response and we'd gotten up

25   to an objection, as I understand it, that basically is

1  that IBM wants assurances that the category -- first

2  category of documents which are otherwise responsive,

3  they want assurances that they are or have been

4  produced.

5          That's not something that is outlined in

6  the agreed protective order.  The procedures there

7  were we give them information about the disclosure and

8  then return the documents.  Well, that apparently is

9  an additional consideration that they have decided is

10  not met or the condition is not met.  That's kind of

11  what we -- we couldn't get the agreement.

12          They proposed something.  Instead of

13  returning the documents, they proposed that we

14  basically return or dispose of the list of the

15  documents that we gave them by way of a privilege log

16  and that we would essentially disregard or remove the

17  folder.

18          The problem with that, Your Honor, is

19  that the documents that are in that folder are tagged

20  with metadata -- and I know Your Honor's familiar with

21  the metadata issues -- that in various fields identify

22  that they are part of that folder.  So we explained to

23  IBM that just disregarding the folder or dropping that

24  folder out of the consideration wasn't sufficiently

25  protective.  We needed to return the documents to make

sure that the documents' contents could not otherwise
be reconstructed.

The dialogue sort of came to an end when
IBM insisted upon further explanation about the
different fields that we were concerned about being
the mechanism for reconstruction. And we politely
said, you know, that's not the issue.

The issue is you need to return the
documents. If you are concerned that we are not going
to otherwise produce the first category of documents,
the agreed protective order provides for a motion to
compel to be brought at a later date. That may happen
on the other issues.

I mean, sufficiency of production is
something that is always a potential issue. At this
point we don't have any issues about whether we have
(inaudible) Rule 34 to collect what's responsive. We
represent to IBM that we have, in fact, done that.

The bottom line is, we need those
documents back because they are critically important
work product. They represent our mental impressions.
I understand from the submission that the documents
have been isolated. I don't know the answer to the
question of whether IBM has examined these documents.
In our prior discussions, counsel wasn't completely

 1    clear on whether or not they knew if the documents had

 2    been reviewed.  And we are urgently insisting on the

 3    return to avoid the consequences of there being a

 4    problem with disclosure of our mental impressions.

 5              That's the -- that's the big picture,

 6    Your Honor.  And we are just asking that they return

 7    the documents and that we reset where we were and

 8    follow the protocol of the agreed protective order and

 9    return product that clearly is mental impressions and

10    should not be disclosed.  And so that's where we are.

11              I'd be happy to follow back when

12    Mr. McGaan or whoever for IBM may speak.  I may have

13    some additional factors that the Court wants to hear

14    from us on.

15              THE COURT:  All right.  Okay.  Shoot.

16              MR. McGAAN:  Thank you, Your Honor.

17    Andrew McGaan for IBM.  There's an easy fix to this

18    problem that side steps what would otherwise become a

19    debate about --

20              THE COURT:  Yeah, I've got -- I've got

21    one in mind.  I've got a fix in mind, but let me hear

22    yours.

23              MR. McGAAN:  Sure.  And there's a

24    little -- little more context that I'd like to

25    provide.  The back and forth here began -- and I'm not

1    going to go back over the -- because it's not going to

2    matter to the outcome, but this began on January 27.

3    We had identified in Bridgestone's production -- we

4    had noticed -- it's a large production, as is ours to

5    them -- but three documents that on their face said

6    privileged or work product or attorney communication.

7                And so consistent with our reading of the

8    ethical rules, we attached them to the letter and sent

9    it over to Bridgestone and said, look what we saw.

10   Are you asserting privilege to these?  And they

11   promptly notified us that they were, and they appear

12   to be privileged on the face of things.  And they

13   triggered their clawback right under the protective

14   order, which is paragraph 22.

15               So we destroyed those.  But they

16   immediately followed up and said, oh, by the way, we

17   have inadvertently also produced this larger

18   collection of 731 documents.  That was the next day.

19   And they told us, as McMullan I think was just

20   describing, that it really contains two kinds of

21   documents in this set.  I don't know how many fall

22   into each subcategory, but I suppose it's not

23   important for the moment.  One subcategory or

24   documents standing alone are not privileged.  They

25   make no privilege claim to them as documents,

1    individual documents.  They don't claim they were

2    created by a lawyer.

3                    THE COURT:  Right.

4                    MR. McGAAN:  They contain privileged

5    legal advice.  The other subcategory's material they

6    told us by letter they claim standing alone they're

7    privileged documents.  And so our first response was,

8    well, okay, you know, we can all read the protective

9    order.  You've got to give us the privilege log

10   setting forth -- we even have an agreed format for the

11   log that would have to be exchanged both in terms of a

12   clawback or when privileged logs are produced in this

13   case in the normal course.  And it's what everyone

14   sees all the time, A, to/from, subject matter of the

15   document and the nature of the privilege claim.

16                    So they sent over a spreadsheet that just

17   says -- provides none of that information.  It just

18   says work product as to all of them without the to,

19   the from and all that.  But I -- that's not really our

20   major complaint here.  Our problem is that in telling

21   us that there's a subset of nonprivilege documents,

22   what Bridgestone has gone on to say is, A, they're

23   privileged, or work product, I should say, that's the

24   assertion, because they're nonprivilege documents --

25   I'm just focusing on that one subset.

1           THE COURT:  Right.

2           MR. McGAAN:  They're nonprivilege

3    documents that were collected by a nonlawyer at the

4    request of a lawyer.  And they will be -- and I'm just

5    reading from the letter they sent to us, they said,

6    these will be otherwise -- these will otherwise be

7    produced from their original source if that original

8    source was collected as part of the agreed upon

9    collections, closed quote.

10           So what they're telling us is we want you

11   to destroy those nonprivileged documents that we

12   produced to you, and you may or may not get all of

13   them separately in our production.  So the first issue

14   is there's no basis in law wherein the protective

15   order to clawback and ask for the destruction of

16   nonprivileged documents, some of which I apparently

17   will never see again.

18           Let me digress for a moment, by the way.

19   On this question of whether we're looking at the

20   documents, there's no confusion about that.  We're

21   not.  The minute they sent us the list and said, this

22   is, we claim, an inadvertent production of 731, we

23   isolated them, no one's looked at them.  The only -- I

24   think what they're referring to is we don't know

25   whether anybody looked at them before.  No one had

1  told us there was anything unique or special about

2  these.  And unless we then cracked open the list,

3  looked at the documents and went back to before all

4  this communication began, there's no way to tell

5  whether anybody ever glanced at one of these earlier.

6  We just don't know.  And we're not making the effort

7  to go find out, because that would be looking at the

8  documents.

9          So I can assure both Bridgestone and the

10  Court that the minute they said, here's 731 we're

11  going to have a disagreement about, maybe, they've

12  been isolated and no one's looked at them.

13          THE COURT:  Okay.

14          MR. McGAAN:  But the other thing we did

15  was took a quick look to say, well, is there a

16  legitimate work product protection under Tennessee

17  law, because -- governing nonprivileged documents

18  gathered at the request of a lawyer.  The answer is

19  no, we weren't able to -- we cited the cases, we don't

20  find law to the contrary, but I think we don't even

21  have to have that debate or have that motion practice,

22  because we proposed an easy fix.

23          We never asked them to tell us -- answer

24  the question which documents were collected by a

25  lawyer, so we're not asking for that.  We don't want

1    to know that here.  And so here's the easy fix.  We

2    can and will delete and destroy the list of them so we

3    won't have in our possession any list or copy of any

4    such list.

5            Secondly, the metadata is no different

6    than words on a word processing document, in a Word

7    document.  It can be deleted.  They can provide us

8    what's called an overlay which just replaces the

9    metadata with innocuous other information if, indeed,

10   the metadata contains things that they're concerned

11   references these were in the Redweld file that

12   Mr. So-and-so gathered at the request of a lawyer, if

13   that's even there or anything like that.  We're happy

14   to have it all deleted.

15           And it solves a big problem.  The big

16   problem it solves is then with respect to, again, just

17   to the nonprivileged documents in this set, they then

18   just disappear for all intents and purposes into the

19   vast sea of 1.3 million documents that they've

20   produced to us.  And there's no way of knowing whether

21   they were ever part of any collection or not.

22           Now, final point.  As to documents within

23   the subset of documents that they claim are

24   stand-alone privileged.

25           THE COURT:  Uh-huh (affirmative).

1           MR. McGAAN:  We would do just what we did

2      with the other three that we identified for them that

3      they appear to have inadvertently produced to us.  And

4      that is, if they provide a valid log, the to, the

5      from, the basis of the privilege, lawyer to client,

6      you know, Lawyer X to Client Representative Y on this

7      date and it's, I don't know, a list of key facts in

8      the litigation, we claim work product.  That's what

9      the order calls for.  That's really not the dispute

10     here.

11           What -- they haven't give us such a log,

12     but that would be -- we'd all follow the steps.

13     Indeed, if they're genuinely privileged documents or

14     so reflected on the log, I doubt that would even be

15     motion practice about it.  But we avoid -- by just

16     cleansing the metadata, we do it or they do it,

17     however -- it's easily done, it's like deleting a word

18     from a document -- so then we avoid debating whether

19     the basis of the privilege being asserted over

20     nonprivileged documents is even valid under Tennessee

21     law because if not, we're not asking for that

22     information.  So that's our -- I think that's a simple

23     way through the thicket here.

24           THE COURT:  Okay.

25           MR. McMULLAN:  Your Honor, if you'd like

1  me to respond before you turn to your suggestion --

2             THE COURT:  Yeah.  Yeah, briefly.

3             MR. McMULLAN:  Do that?

4             THE COURT:  Briefly, because I've -- I've

5  got an idea how I want to go on this, but I always

6  like to make sure I'm not getting myself out on a

7  limb.

8             MR. McMULLAN:  Yes, sir.  And the issue

9  about Category A, I think I understand it, as I

10 indicated in the submission, our concern is that there

11 are multiple fields, multiple labels by which IBM

12 could reconstruct -- I'm not suggesting that they

13 would, but they could reconstruct.

14            And so the idea that we have to provide

15 assurances that we are otherwise producing -- we

16 represented that we have and will, presupposes that we

17 have not followed Rule 34 or we will not Rule 34

18 providing responsive documents.  And this will result

19 in -- the first listing, you know, posing of something

20 that assumes that we haven't collected responsive

21 documents and provided them otherwise.

22            Well, that's just the effect, asking to

23 do what I would never ask Andy to do, which is make

24 sure that you include in your production a copy of

25 your work file, so that way I know that you produced

1    everything.  That's the net effect is that we are
2    assumed to not have done our collection and production
3    in accordance with Rule 34.  And I don't think that's
4    part of what the agreed protective order ever
5    contemplated.
6              It's certainly -- for the privilege log,
7    we could not identify in greater detail without doing
8    exactly what we fear, which is giving them an idea of
9    what subsection or subset of documents we think to be
10   privileged.  We didn't brief this issue, Your Honor,
11   but I'll mention that we looked at the log list, and
12   the selection of documents is at the very heart of
13   what is privileged.
14             In reflection of mental impressions, the
15   rules -- Rule 26 itself talks about not reflecting or
16   revealing mental impressions of counsel.  We looked at
17   the law that Mr. McGaan's firm cited.  It was a
18   different set of facts related to preparation of a
19   witness for a deposition.
20             But the law is very clear that the
21   selection of documents and the compilation of
22   documents by counsel, whether it's by counsel with his
23   own hands or her hands or whether it's at the
24   direction of counsel, that is clearly the type of work
25   product and pretrial preparation that the rules and

1   Supreme Court say -- they describe as being highly

2   protected, opinion work product.  We can brief that up

3   if we need to, but we didn't get into that in our

4   submission.  We thought we were past that issue.  But,

5   Your Honor, I'll turn it back over to you.

6               THE COURT:  Okay.  Well, it seems to me

7   like we've obviously got two separate issues, and on

8   the first set of documents which are -- essentially

9   you're claiming work product because in this folder

10  this sort of is an indication of what you consider the

11  most critical documents.

12              So it's like you'd be asked to provide

13  discovery and please list in order of priority those

14  documents that you -- that you consider the most

15  sensitive.  And obviously that's something -- that is

16  attorney work product and impression, et cetera.

17              It seems to me like on the first issue

18  there's two solutions that would make sense to me.

19  One is essentially just to return the documents and at

20  the appropriate time that Bridgestone will say,

21  these -- the documents that were previously returned

22  to us have been -- are -- have been provided to you

23  through -- through our normal production.  That, to

24  me, is the simple solution to it.

25              Now, the other possibility of pulling the

1    metadata, that -- that certainly I don't think is out

2    of the question, but why, if -- it does seem that

3    these are not being claimed as privilege because of

4    content, but they're being claimed privileged because

5    they've been classified as a -- into a particular

6    folder, which at the -- which is part of the

7    litigation strategy.

8            And so long as, as I understand it,

9    Bridgestone is -- I'm sorry, IBM -- yeah, Bridgestone

10   wants them back.  That Bridgestone, if they get them

11   back but as they go through their discovery, if they

12   just certify to you at some point that those documents

13   that were returned to us have been -- are -- have been

14   included in our normal production, that's the easy

15   solution to me.  And if some of them haven't, then

16   we've -- they should all be provided because you're

17   saying they're not -- they are -- they are germane to

18   the production, it's just having them listed in a

19   particular folder as being, perhaps, particularly

20   critical documents isn't.

21           That part of it is the -- the

22   classification of them I see -- I see that as being

23   valid work product.  And so I -- as far as I'm

24   concerned, if all we have to do there is work out a

25   way that they come back to IBM during the regular

1    production without the classification that they're
2    semi-smoking guns or something else, that, to me,
3    covers that.  I don't understand why that wouldn't
4    work fairly easily.
5                    MR. McGAAN:  Can I address that,
6    Your Honor?  I -- I would accept that solution.  The
7    reason I don't think we got there between the
8    parties -- and, you know, Your Honor blessedly doesn't
9    have to hear about various disputes that we resolve.
10                   THE COURT:  Right.
11                   MR. McGAAN:  You don't need to hear about
12   those, but believe it or not, we're able to resolve
13   many disputes.
14                   THE COURT:  Yes, I know you are.  I
15   appreciate that.
16                   MR. McGAAN:  I would accept that, because
17   what's different than where we've been so far -- and I
18   think it's a helpful suggestion.  To the extent -- let
19   me put it in my own words because I don't want to
20   misunderstand where Your Honor's going --
21                   THE COURT:  Yeah.
22                   MR. McGAAN:  -- and you can tell me if
23   I'm wrong, obviously.
24                   THE COURT:  Okay.
25                   MR. McGAAN:  But the subset of this

1   collection that are not as individual documents claim
2   to be privileged, but the only privilege claim is
3   this, it was gathered at the request of a lawyer
4   privilege claim.
5               If that -- as to those, if Bridgestone
6   can certify to the Court, represent to the Court, that
7   IBM destroyed the nonprivileged documents subset, they
8   have been or will be produced in the normal course by
9   IBM, they should have all been produced by now anyway,
10  but whatever the case may be, I don't want to get hung
11  up on that, I think that's where you're going.
12              THE COURT:  Yeah, you're exactly --
13  you're exactly right.
14              MR. McGAAN:  Yeah, they weren't willing
15  to give that -- yeah, they weren't willing to give
16  that assurance before, but if they'll give that
17  assurance, yes, that solves the problem.  I meant it
18  when I said, we didn't ask them to produce documents
19  to us based on how lawyers gather them.
20              So we can avoid the debate about whether
21  that's a valid privilege claim under Tennessee law
22  entirely, and what you say would solve that.  That way
23  we'd have the assurance that we weren't destroying
24  through a clawback mechanism nonprivileged documents.
25  They're not entitled to that.  But if, again, during

1   the production elsewhere or will be coming, we have

2   different metadata, so we'll never know that they were

3   on that list, yes, with that order, Your Honor, that

4   solves the problem.  It leaves the other subset to be

5   addressed, but that solves the problem.

6                   THE COURT:  Yeah, I'm going -- I'm going

7   to take it one at a time.

8                   MR. McGAAN:  Okay.

9                   THE COURT:  All right.  That's where I'm

10  going on that one.  All right.

11                  Now, as to the documents that there is a

12  claim that the documents are privileged, that, to me,

13  again, this turns on a privilege log.  And as I

14  understand it, the question there is, is what's been

15  provided so far an adequate privilege log.

16                  Now, to me, you know, the privilege log

17  is pretty well laid out that it would identify the

18  document by date, the to/from and a brief description

19  of why it's privileged.  Email from Lawyer Smith to

20  Manager So-and-so, dealing with kind of broad brush.

21  I mean, clearly you do always have the problem of not

22  being so specific as to give away the privilege.  And

23  on the other -- that's one extreme.  And other extreme

24  is that it's so broad, you don't have the faintest

25  idea what it's about or why it would be privileged.

1   Discussion of weather.  Well, you know, that's so

2   broad, is it privileged or not.  I mean, so it seems

3   to me that on those, that would -- that would -- it

4   sounds like the privilege log needs to be sharpened up

5   a bit -- a bit on that.  Now, if that doesn't resolve

6   the issue, I don't know how many -- do we know roughly

7   how many are in that subset of documents?

8           MR. McMULLAN:  Your Honor, this is David

9   McMullan.  Mark Woods on the call may have the number.

10   Mark, if you would, if you know it, why don't you

11   chime in.

12           MR. WOODS:  Yes.  On the privilege log we

13   included approximately 34 documents that are true work

14   product.  I included everything that the parties had

15   agreed to produce in the agreed-to privilege log

16   format.  I think maybe where the confusion is coming

17   in is the particular 34 documents that were true work

18   product simply don't have some of the metadata fields,

19   so there's nothing to fill in on the privilege log.

20           There was no -- the only portion of the

21   privilege log where that metadata was withheld is

22   explicitly put in the privilege log itself, and if the

23   actual privilege log has a blank space, then that's

24   because the metadata simply doesn't exist for that

25   document.

1      THE COURT:  Well, maybe -- metadata --

2      MR. WOODS:  I'm sorry --

3      THE COURT:  Yeah, but metadata aside, I

4  mean, you know what the document is.  It seems like

5  you've got a -- you've got to fill in -- you have

6  to -- sometimes you have to go back and do things

7  manually.  I mean, you know, the to/from and date and

8  a generic description, I mean, that's what you

9  normally have.

10      I haven't gone back and looked

11  specifically at your -- you know, the matrix you-all

12  had, but that to me is what -- you know, that's what

13  it would need to resolve it.  Now -- and seems to me

14  that if you can give a little bit more information --

15  otherwise, if we're only talking about 34 documents --

16  now, let me be careful here, let me rephrase that a

17  little bit.  Do we know roughly how many pages are in

18  these 34 documents?

19      MR. WOODS:  Your Honor, I don't know the

20  answer to that question.

21      THE COURT:  Okay.  Because what I was

22  thinking was rather than getting into a whole lot of

23  back and forth is just submit 34 -- these -- put 34 --

24  34 documents, if I'm thinking they're a couple of

25  pages, I can look through that and take a quick look

1    and decide whether it's privileged or not.  Now, if

2    one of those documents is 500 pages, I'm not sure I

3    want to bite into that apple.

4                But my thought is, if you don't think

5    that giving a bit more information as to the nature of

6    the privilege, why it's privileged, then I think the

7    best thing to do is me just take a look at them.

8                MR. McMULLAN:  Your Honor --

9                THE COURT:  Provided -- provided --

10   provided I'm not biting into -- you know, that I'm

11   looking at 34 documents that, you know, are not -- not

12   going to get me into several hundred pages.

13               MR. McMULLAN:  Your Honor, this is David

14   McMullan.  I'm fine with any additional information we

15   need.  As I understood Mr. McGaan's position, I don't

16   think there's any dispute about that category of

17   documents being a category they had no objection to

18   returning already, but if we --

19               THE COURT:  Oh, if they're willing to

20   return them, so be it.  I mean, that ends it.

21               MR. McGAAN:  Yeah, I --

22               THE COURT:  I thought -- I thought he

23   didn't want to return them until he got a little more

24   information.  Maybe I missed something there.

25               MR. McGAAN:  Andy McGaan, Your Honor.

1    Yeah, the protective order calls for notification of

2    the clawback and permission of a privileged log.  And

3    we're not asking for anything more different than I

4    think what Your Honor's referring to, the classic

5    objective information about a document that lays the

6    foundation for the privilege claim.

7              You can't say it's just work product and

8    that's all I'm going to tell you.  I don't want to

9    file motions on privilege, but that doesn't give me

10   any basis to evaluate whether we have a dispute.  So

11   if a -- if it's not a letter or email that has a

12   to/from, if they're asserting work product, they must

13   have a factual basis for it.  I know they would.

14             And so they ought to be able to say,

15   Lawyer X created something and do it a

16   generic descrip- -- I'm surprised we're even having a

17   discussion about this.  You do a generic description

18   that reflects the fact that it's work product by

19   Lawyer X.  Maybe it's a chart, maybe it's a list,

20   maybe it's an analysis that was a memo to file.  It

21   doesn't always have to be, as we know -- it could be a

22   spreadsheet.  But it isn't always an email or a

23   letter.  But -- and this is going to implicate the

24   privilege logs that we have to exchange with each

25   other in connection not with the clawback, but the

1   overall production.

2           THE COURT:  Sure, you're going to have --

3           MR. McGAAN:  It's just the bare -- it's

4   just the bare factual information that lays the

5   foundation for the privilege claim.  And quite

6   frankly, assures the other side that it's well-taken

7   and maybe we don't have to have a dispute about it.

8   Right now their log doesn't do that.  So, yes, if they

9   give us the basic traditional privilege log and not

10  leave the stuff blank --

11          THE COURT:  Yeah.

12          MR. McGAAN:  -- then we'll -- then they

13  will have triggered the clawback.

14          THE COURT:  All right.  Here's where I'm

15  going on that.  See if you can sharpen up the

16  privilege log a little bit.  If after it's sharpened

17  up there's still a dispute that that's not proper

18  privilege, then submit that to me under seal, and I'll

19  decide it, rather than getting into a long -- long --

20  I don't want -- I don't want to drag this out any more

21  than I have to.  And that seems to me the easiest way

22  to do that.

23          MR. McMULLAN:  Thank you, Your Honor.

24          THE COURT:  Okay.  All right, now, the

25  second issue -- let me get my -- laid my glasses down

1   and couldn't find them.  All right.  The second one is

2   on these documents from Bridgestone Japan.  And I've

3   really only got the briefing on one -- sort of one

4   side on that, that -- that -- I believe IBM wanted to

5   brief it.  And Bridgestone basically said it's not in

6   their possession, control, custody, et cetera, and I'm

7   assuming you're saying, what, if they want that,

8   they've got to -- they're going to have to subpoena it

9   directly from Bridgestone Japan?

10              MR. BARRETT:  Yes.  Your Honor, this is

11  Don Barrett for Bridgestone.  That's right.  I mean,

12  we'd be glad to, you know, to write them a letter, and

13  I'd be glad to ask.  We have no objection to their

14  getting the documents, but, you know, the -- but the

15  question's right, they lay it out correctly, does --

16  does Bridgestone America have the legal right,

17  authority or ability to obtain the documents requested

18  upon demand.  We have no such right, we have no such

19  authority and we have no such ability.

20              The Court will not put Aubrey Harwell and

21  me and our CEO, Gary Garfield, in jail.  We'd just

22  have to go sit in jail because -- I mean, we can't

23  do -- we don't have that authority or --

24              THE COURT:  You mean I can put --

25              MR. BARRETT:  -- or ability over

1    Bridgestone Japan.

2              THE COURT:  You mean I can put

3    Mr. Harwell in jail?

4              MR. BARRETT:  Yes, sir.  In fact, I

5    wouldn't mind.  His son Trey is on the line.  I doubt

6    he'd mind either.

7              MR. TREY HARWELL:  I wouldn't -- I

8    wouldn't mind either.  On Sunday (inaudible).

9              THE COURT:  Well, I'm not -- I'm not

10   considering putting anybody in jail, obviously.

11             MR. BARRETT:  I know, I'm just kidding,

12   Your Honor.

13             THE COURT:  And I am too.  I appreciate

14   the offer.

15             MR. BARRETT:  Right.  But the fact is is

16   that no court has ever ordered my client to produce

17   these -- you know, such Japanese documents from

18   Bridgestone Japan.  And a big company like

19   Bridgestone's in litigation all the time.

20             We are, you know -- we have a separate

21   business.  We are owned -- the stock of the company is

22   owned by Bridgestone of Japan, but we're a separate

23   business.  And we don't have that authority.  And --

24             THE COURT:  Well, I --

25             MR. BARRETT:  I think that they're just

1     asking that they could, let's have a briefing

2     schedule, and we agree.  If we want to -- they've got

3     the obligation to establish that we have such control.

4     They're not ever going to be able to do that because

5     we don't, as a matter of fact.

6                THE COURT:  All right.

7                MR. BARRETT:  But let them -- let them do

8     it.  We agree to that schedule that they suggested.

9                THE COURT:  All right.

10               MR. McGAAN:  Your Honor?

11               THE COURT:  Yes.

12               MR. McGAAN:  Andrew McGaan for IBM.

13    Yeah, that's exactly why we suggested the briefing

14    schedule.  The issue is far more involved than

15    Mr. Barrett describes it.  One of the cases we cite in

16    the footnote in our submission involves a subsidiary

17    in the United States of a Japanese company that was

18    ordered to produce documents against the kind of

19    arguments that Mr. Barrett just made.  So it's far

20    more involved, it's nowhere near as cynical --

21               THE COURT:  Okay.

22               MR. McGAAN:  -- as that.  And that's why

23    we suggested -- it's not a recent issue.  Bridgestone

24    in their submission said we brought this up recently.

25    This was in our production request, the original one

1   we filed last April.  They objected to it in due

2   course.  We've met and conferred, we've exchanged

3   letters.  Bridgestone took the position that we should

4   wait till the production that was being completed the

5   end of last year be done and we'd review it.  We've

6   done that.  That's been helpful.  It has a lot of

7   factual information on this issue.

8               THE COURT:  But you still want some more

9   documents.  Yeah.  You still want some more documents,

10  okay.

11              MR. McGAAN:  What's that, sir?

12              THE COURT:  I say, you still want some

13  more documents from Japan.  Okay.  As I said, I was --

14  I don't -- I did want to see what the briefing would

15  be on that, so let's go ahead and I'll -- I've got

16  your letter here.  I believe -- let me look back at

17  it.  You did suggest --

18              MR. McGAAN:  Yes, bottom of page 2.

19              THE COURT:  All right, yeah.

20              MR. McGAAN:  (inaudible.)

21              THE COURT:  And they don't object to

22  that, so I'll buy -- I'll buy that.  Go ahead and

23  brief it.  I can tell you my -- you know, my -- if you

24  can't convince me that they can -- that they can go

25  that way, the other thing is, of course, so we don't

```
 1    drag this out any longer than necessary, would be, you
 2    know, you could go ahead and issue the -- issue your
 3    necessary subpoenas and such to -- for Bridgestone
 4    Japan, to the extent you're going to go that way with
 5    it.
 6              At least those, then, would be gone, if I
 7    decided that, yeah, that's the way you've got to go.
 8    You wouldn't have wasted a month or two to get the
 9    request out.  So they -- they're going to know what --
10    Japan's going to know what the request is.  Of course,
11    obviously if I say, well, you've got to go that way,
12    then we'd be in a position to -- if they don't come
13    across with the documents, they've either got to file
14    a motion for protective order or you've got to file to
15    compel.
16              But we won't -- we won't wait a couple
17    months until I say one way or the other on this other.
18    I mean, obviously if I say that they are covered and
19    have to -- that Bridgestone America has to provide it,
20    that's obviously at that point, I'm sure, going to get
21    appealed to the district judge, and that will get --
22    that will get into a mess.
23              I'm certainly not going to rule on that
24    until I've read the case a little more.  But I'm just
25    trying to think, to keep the case moving so we don't
```

1     get bogged down, you can certainly go ahead and make

2     your -- you know, formal -- formal subpoenas or

3     whatever, to Japan and, you know, it may be that

4     that's the easiest way to resolve that, rather than

5     getting into a long -- I mean, they're going to --

6     unless they're going to object to furnishing the

7     documents under subpoena, you get them that way, and

8     so I kind of -- I don't know whether that's a fight we

9     need to have.  But if we do, you know, so be it.  I'll

10     rule on it.

11            MR. McGAAN:  And we'll look into that.

12     The normal course, our expectation is, that seeking by

13     subpoena documents from overseas directly from parties

14     that can be obtained directly --

15            THE COURT:  Oh, yeah.  I mean, I can

16     understand it's easier.  It's easier to ask --

17            MR. McGAAN:  Right.  Right.

18            THE COURT:  -- ask them to do it

19     because -- and it's easier for them to get it.  But on

20     the other hand, it may be that given -- there is a

21     relationship, obviously, between Bridgestone America

22     and Bridgestone Japan, that I'm sure there is -- I

23     know there's regular communication back and forth

24     between them.  It may be that they just want to --

25     they just want to be careful they don't establish a

1    precedent that every time somebody wants something

2    from Japan, they just get it through America.

3            But that, you know, if Japan gets the

4    request, Japan's willing to -- answers the matter and

5    you got the documents, and that preserves their right

6    of independence but does not hamper you in getting the

7    documents.

8            MR. McGAAN:  Right.  And to be clear, if

9    plaintiff's counsel wants to facilitate that, we don't

10   need to set any precedents here.  So if they want to

11   facilitate that, because all we care about is the

12   document, not the precedent, happy -- happy to go that

13   route.

14           THE COURT:  And that may -- may be

15   well -- that may be something Bridgestone really

16   should consider is, as long as they go through the

17   formal subpoena, that, you know, you give them a

18   little help in getting it out, unless there's, you

19   know, some real objection to it.  That way that

20   preserves your -- your independence, but doesn't get

21   us into -- that's a knot I don't have to try to cut.

22           MR. BARRETT:  Right.  Your Honor, we

23   don't -- have no desire to keep them from seeing

24   whatever documents that they're seeking.  We haven't

25   seen any of those documents.  We don't -- it's not

```
1    like we have them.  And I don't -- we don't have any
2    objection to writing a letter.  When they send us a
3    copy of their subpoena, and we'll write a letter
4    saying we don't have any objection.
5                    THE COURT:  Okay.
6                    MR. BARRETT:  But it's -- you know,
7    the --
8                    THE COURT:  Well, you don't want to --
9                    MR. BARRETT:  Talk about a parent company
10   reminds me of -- it's like one of my children when
11   they were six, seven years old.  Charles was on the
12   phone and him telling me what to do.  Well, I might.
13   You know, but -- but I'm not going to be hurried to --
14   that I have to.
15                    THE COURT:  Right.
16                    MR. BARRETT:  I mean, I just --
17   (inaudible).
18                    THE COURT:  I think I -- I think I -- I
19   think I understand you-all both perfectly on this.
20                    MR. BARRETT:  Yes, sir.
21                    THE COURT:  And I understand -- I
22   understand exactly why you're doing what you're doing,
23   and it makes perfect sense to me.  I've tried to
24   suggest a way that we can both -- I'm trying to get
25   into a win/win rather than I have to say --
```

1          MR. BARRETT:  Yes, sir, I understand

2     that.  And we'll -- we'll cooperate to the extent that

3     we can.

4          THE COURT:  All right.  And that may

5     totally resolve the matter.  Okay.

6          MR. BARRETT:  Yes, sir.

7          THE COURT:  Now, that leaves us then with

8     items 3, 4 and 5, and those I guess were IBM's.  So

9     I'm not sure where -- where we are on that.  I got --

10    ripe question mark and Bridgestone -- this is the

11    noncustodial data, the laptop computers issued to IBM

12    employees and the review of the seed set and what

13    effect -- whether the seed set was checked and you've

14    got nonresponsive, and whether they went back and made

15    corrections.

16          I've only got kind of one side of that,

17    so I'm not sure if this one's -- I'm not sure what I

18    can do at this point on that.  I've kind of got half

19    the -- I'm like Paul -- unlike Paul Harvey, I don't

20    have the rest of the story.

21          MR. McGAAN:  Christine Payne will address

22    that, Your Honor.

23          THE COURT:  Okay.

24          MS. PAYNE:  Thank you, Your Honor.  And

25    good afternoon.  This is Christine Payne on behalf of

1    IBM.  And, yeah, I'll address these three.  One we may

2    be able to take out for discussion here.  But turning

3    to No. 3, the request for assistance with respect to

4    the noncustodial production, this goes back to an

5    issue that was raised by Bridgestone last year.

6            And Bridgestone wanted the parties to

7    exchange information about sources of noncustodial

8    production.  We provided that information back on

9    December 10, which was actually -- would have been

10   within three business days of their original request.

11   Now, we've asked several times for Bridgestone's

12   information, you know, the corresponding information,

13   but we haven't received a response.

14           Just so Your Honor's kind of familiar

15   with what this information is, it's pretty basic.

16   Within each party's production of noncustodial

17   documents, we designate in the metadata, you know,

18   kind of a source.  And so we have -- you know, some of

19   the sources are just, you know, kind of shorthand,

20   like, for example, Bridgestone has a custodian

21   designation, it's called OTC program.

22           I'm assured that that, you know, has a

23   more fulsome description and kind of what that means

24   or there's one called WPS.  There's a couple called

25   noncustodial files.  So we just need a little bit more

1    information about what those things mean so that we

2    can review and analyze Bridgestone's noncustodial

3    production.

4             We provided that information back on

5    December 10, and at this point all we're really asking

6    is the Court's assistance in getting a deadline by

7    which we're going to receive that information.  We've

8    asked for February 9.  I think that this is relatively

9    straightforward information, and so it's a fairly

10   reasonable deadline.

11            And it's also good because we're at the

12   point now where IBM's really not able to review

13   Bridgestone's production in the way that Bridgestone

14   is able to review ours, because we don't understand

15   necessarily the sources of noncustodial documents that

16   they have provided here.  That's all we're asking is

17   just, you know, by a date certain we will receive that

18   information that we've already provided.

19            THE COURT:  Okay.  Well, let me hear

20   from -- let me hear from Bridgestone on that one,

21   then.

22            MR. WOODS:  Your Honor --

23            THE COURT:  This is a little bit of a

24   sauce for the goose, delectable diet for the gander.

25   They gave you -- they showed you theirs, now you need

1  to show them yours.

2           MR. WOODS:  Your Honor, this is -- this

3  is Mark Woods for Bridgestone.  I'd like to -- I can

4  address this issue --

5           THE COURT:  Great.

6           MR. WOODS:  -- pretty succinctly.  In the

7  December 10 letter that Ms. Payne references, it's

8  true we did ask about noncustodial sources.  In

9  particular we asked about eight individual

10  noncustodial sources that we did, in fact, get from

11  IBM's metadata as the source.

12           Unfortunately, it's not as easy as it's

13  made out to be.  It is true that in our metadata we

14  did include a source of where the information came

15  from.  What I would ask IBM is that they identify the

16  specific sources that they don't -- or that they need

17  information about, and here's why I would ask that.

18           In our production just in the

19  noncustodial data, Your Honor, there are 62,000

20  different ED sources.

21           THE COURT:  Wow.

22           MR. WOODS:  It is really hard by

23  February 9 to give them a list and a thorough

24  description of all 62,000 sources.  So I think that

25  might be the solution is that if they will identify

1   the specific sources that they want more information

2   about, we'll be happy to accommodate.

3           MS. PAYNE:  Sure.  And I -- I think

4   that's perfectly reasonable.  We can --

5           THE COURT:  Okay.

6           MS. PAYNE:  -- definitely do that.  I

7   think that we're talking about a higher level of

8   identification, rather than getting down to -- I don't

9   quite know what the ED sources that Mr. Woods refers

10  to, maybe a folder path or something like that.  We're

11  talking about just the designation of the noncustodial

12  source.  And I think that there's fewer than a dozen.

13  But we can go ahead and get that to them.

14          THE COURT:  Okay.

15          MS. PAYNE:  I think part -- part of the

16  issue is, you know, and -- part of the issue is when

17  we have these discussions when we're asking for the

18  information repeatedly, you know, if this is something

19  that would enable Bridgestone to respond more quickly,

20  we want to be able to get that to them quickly.

21          I think we need to be able to have a

22  mechanism where we get that response more quickly

23  without having to kind of run to Your Honor for

24  assistance there.  We can get that list to Bridgestone

25  within the next couple days.  If we can then get a

```
1    date certain by which the --
2              THE COURT:  Okay.
3              MS. PAYNE:  -- information would be
4    provided to IBM.
5              THE COURT:  All right.  What I'm going to
6    do on that is, if you -- I'm going to -- I'm going to
7    tell them to respond to your request seven days after
8    they get your -- after you've identified what you
9    want.
10             MS. PAYNE:  Okay.  Thank you, Your Honor.
11             THE COURT:  So that will -- as soon as
12   you get it, they've got seven days.  Or as soon as you
13   get it to them, they've got seven days.  All right.
14   Well, that one wasn't too bad.
15             MS. PAYNE:  Okay.
16             THE COURT:  No. 4, laptops.
17             MS. PAYNE:  The next one's going to be
18   similar and hopefully won't be too bad either.  This
19   is, again, just an issue of needing a response.  And
20   it's during the course of our investigation we learned
21   about laptop computers that had been issued by
22   Bridgestone to certain IBM employees when they were
23   actually working, you know, at Bridgestone --
24             THE COURT:  Right.
25             MS. PAYNE:  -- during the course of the
```

1    OTC project.  And those laptops were given back to

2    Bridgestone when the employees stopped.  So we just

3    basically ask, you know, how many were there, they've

4    been collected and data been produced from them,

5    what's their current status.  And we just -- we just

6    need a response on that.

7                    THE COURT:  From Bridgestone's

8    standpoint, how many are we talking about here?  Is

9    there a problem in, you know, getting -- you know, I

10   don't know whether they were crushed, recycled or --

11   are we talking about a hundred or are we talking about

12   a thousand or -- do you have any rough idea what the

13   scope we're talking about here and how much difficulty

14   it is to know what happened to them?

15                   MR. WOODS:  Your Honor, this is Mark

16   Woods again.  The simple answer to your question is I

17   don't know how many laptops were issued to IBM

18   employees.  As IBM's aware, dozens of IBMers were on

19   the -- on the ground at Bridgestone's offices in

20   Nashville, and I do know that laptops were issued but

21   honestly do not know how many laptops were issued to

22   IBM employees.

23                   THE COURT:  Okay.  You know, again

24   this -- you know, it may be it was on an informal

25   basis.  It may be, to go back to my military days,

1     they were issued on a hand receipt.  Of course, a hand

2     receipt, once you turned it back in, they tore it up.

3               So I guess -- it seems to me like they're

4     entitled to -- as reasonable an answer as you can give

5     them.  And the answer may be, some of it you don't

6     know.  But to the extent that you do know what

7     computers were issued and, you know, turned back in,

8     what's your normal procedure.  You know, when they

9     come back in are they wiped clean and reissued --

10              MR. WOODS:  Yes, Your Honor.

11              THE COURT:  -- or something.  I know a

12    lot of companies I think do -- you know, when they

13    come back in, they have a fairly sophisticated wiping

14    program and they reprogram -- wipe them out and

15    reprogram them.  If so, that's the short answer.

16              MR. WOODS:  We'll find that out and

17    report, Your Honor.

18              THE COURT:  Okay.  Now, they wanted a

19    time limit on it.  I don't know, what's a reasonable

20    time, you think, to get them an answer?

21              MR. WOODS:  I wish -- I wish I could say.

22              THE COURT:  Well, if I put -- if I put --

23    if I said three weeks or something, 21 days or

24    something, is that -- is that too long?

25              MR. WOODS:  That sounds reasonable.  And

```
1   if -- if it's somehow for some reason that that is not
2   reasonable, we'll find out in plenty of time --
3                 THE COURT:  Right, and you'll be able
4   to --
5                 MR. WOODS:  -- and talk to them about it
6   and we can talk to you if we need to.
7                 THE COURT:  Right.  You can work out a
8   new date with them.  As long as you work out a new
9   date and agree on it, you don't need to get back with
10  me.
11                MR. WOODS:  Yes, sir.
12                THE COURT:  All right.
13                MR. WOODS:  Okay.
14                THE COURT:  The last thing, then -- let's
15  see, my note says -- this one's getting into some
16  areas -- this is on our predictive coding.  This could
17  be a little trickier.
18                MS. PAYNE:  Well, it might be a little
19  bit trickier --
20                THE COURT:  Hopefully not.
21                MS. PAYNE:  -- but I think we may be able
22  to pass on discussing this one today.
23                THE COURT:  Okay.
24                MS. PAYNE:  This morning right before the
25  hearing Bridgestone sent over some information to IBM
```

```
1    about its treatment of the seed set.  And so we're

2    going to review that.  We may have some follow-up

3    questions --

4                THE COURT:  Okay.

5                MS. PAYNE:  -- for them, but, you know,

6    what we were looking for was a response.

7                THE COURT:  Correct.

8                MS. PAYNE:  So now that we've got that,

9    we'll go back, we'll look and see if we have any

10   questions.  For today, I don't believe that there's

11   anything for Your Honor to decide.

12               THE COURT:  Well, I'm not going to look

13   for something else to decide.  I will say that

14   obviously on the predictive coding, because I did

15   allow Bridgestone to change horses in midstream a

16   little bit, I think I was pretty clear, I expect a

17   very full and complete discussion of -- disclosure of

18   how they're doing it.

19               So that's going to be my touch stone of

20   kind of where I work from.  Sounds like y'all are

21   working on this and so I'll just leave it at that.  I

22   won't -- I won't go any further.  And hopefully

23   it'll -- it can be worked out.  Because it would seem

24   to me that, you know, if -- if, in fact, you know,

25   adjustments needed to be made, then Bridgestone needs
```

1  to tell IBM what adjustments they're making so we can

2  have predictive coding produce as good a result as is

3  reasonably possible.

4             MR. WOODS:  Yes, sir.  Bridgestone is

5  excellently committed to transparency in our

6  predictive coding process.  And we're sure that IBM

7  will be just as transparent in theirs.

8             THE COURT:  Right.  Fair enough.

9             MR. WOODS:  (inaudible).

10            THE COURT:  All right.  Anything else I

11 can do to or for you today?

12            MR. WOODS:  No, sir, Your Honor.  Thank

13 you very much.

14            THE COURT:  All right.

15            MR. McMULLAN:  Thank you, Your Honor.

16            THE COURT:  I'll try to get this out --

17            MR. McGAAN:  Nothing else from IBM,

18 Your Honor.

19            THE COURT:  Do y'all need to talk any

20 further while y'all are hooked up?  I'll get off --

21            MR. WOODS:  I need to talk to Christine.

22 If I could talk on the Court's nickel here for about

23 two seconds --

24            THE COURT:  Yeah. I tell you what do --

25            MR. WOODS:  -- that might make --

1          THE COURT:  Let me turn off my recorder

2   and I'm going to put it on hold, which means I don't

3   listen to any of it.  My secretary will punch back up

4   in about five minutes.  And if anybody's there, she'll

5   hang back up.  If nobody's there, she'll cut the line

6   off.  I'll leave y'all connected.

7          MR. WOODS:  Thank you, Your Honor.

8          THE COURT:  Y'all have a good day.

9          ***End of electronic recording***

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE**

2

3              I, Roxann Harkins, Official Court Reporter

4    for the United States District Court for the Middle

5    District of Tennessee, in Nashville, do hereby

6    certify:

7              That I transcribed by **electronic recording**

8    the proceedings held on February 4, 2015, in the

9    matter of Bridgestone v. IBM, Case No. 3:13-cv-01196;

10   that said proceedings in connection with the hearing

11   were reduced to typewritten form by me; and that the

12   foregoing transcript is a true and accurate transcript

13   of said proceedings.

14

15             This is the 11th day of February, 2015.

16

17                       s/ Roxann Harkins
                         ROXANN HARKINS, RPR, CRR, LCR
18                       Official Court Reporter

19

20

21

22

23

24

25