| | | |
|---|---|---|
| BRIDGESTONE AMERICA'S, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:13-cv-01196** |
| **v.** | ) | |
| | ) | **Judge Sharp** |
| **INTERNATIONAL BUSINESS** | ) | **Magistrate Judge Brown** |
| **MACHINES CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Defendant International Business Machines Corporation ("Defendant" or "IBM") filed a *Renewed Motion to Dismiss Plaintiff's First Amended Complaint* (Docket Entry No. 143), to which Plaintiff Bridgestone America's, Inc. ("Plaintiff" or "BSAM") filed a response (Docket Entry No. 149) and Defendant filed a reply (Docket Entry No. 153). For the reasons discussed herein, the Court will grant in part and deny in part Defendant's motion.

## RELEVANT PROCEDURAL HISTORY AND FACTUAL BACKGROUND

BSAM[1] and IBM, two multinational corporations, entered into a series of contracts to design and implement a computer system to help manage BSAM's North American tire operations.[2] BSAM called it the Order-to-Cash or OTC Project. Chief among this project was

---

[1] BSAM, the North American subsidiary of Japan-based Bridgestone Corporation, is an international manufacturer and retailer of tire and other rubber products. (Docket Entry No. 138). Its "primary business" is the manufacture, sale and distribution of more than 8,000 different types and sizes of tires. *Id.* North American customers alone submit about "one product order per second, eight hours per day, five days a week." *Id.*

[2] Unless otherwise noted, the allegations are drawn from Plaintiffs' Amended Complaint (Docket Entry No. 138, Am. Compl.).

the SAP OTC All Division Rollout (the "Rollout Project"). To carry out the Rollout Project, BSAM and IBM entered into a number of contracts.

The first was the January 9, 2009 Master Services Agreement. (Am. Compl. at ¶44). The MSA, which served as the foundation of the parties' relationship, left the provision of specific work to Statements of Work ("SOWs") and Project Change Requests ("PCRs"). (*Id*. at ¶45). The MSA's terms are incorporated in the SOWs, and in turn the terms of both the MSA and applicable SOWs are incorporated in the PCRs.

In 2008 IBM, along with other competitors, responded to BSAM's first Request for Quotation ("RFQ") seeking a company with the experience and resources necessary to finalize and implement the SAP OTC solution needed for BSAM's Commercial Tire Division. IBM was awarded the work based on its detailed representations contained in its lengthy written response. After IBM declared the OTC Commercial Tire solution design completed in 2008, but before implementation proceeded, BSAM decided to pursue an OTC solution for all of its North American tire operation rather than one division, and in January 2009, BSAM issued a second RFQ for the determination of whether the finalized IBM Commercial Tire SAP OTC solution design could be scaled and implemented for all of BSAM's North American Tire Operations (BATO). (Am. Compl. at ¶¶34-39 [First RFQ], 46-56 [Second RFQ]). In IBM's Responses to the two RFQs, totaling over 300 pages, IBM addressed every area of specialized IT expertise and experience required to deliver the design, development, testing, and implementation of the solution. IBM presented itself as uniquely qualified to deliver this Project and promised to work as a partner, not just a vendor. (Am. Compl. at ¶¶49-51; Exs. A and B, Executive Summary).

IBM understood the importance of project management, and it specifically represented that its Worldwide Project Management Method, defined "the way in which projects are

managed throughout IBM," providing a proven framework "to govern a large and complex information systems modernization project" and reduce risks to Project success. (Am. Compl. at ¶¶10, 18, 33, 35-37, 47, 61, 142). IBM also represented that it utilized proven "software development methodolog[ies]," and global development and delivery processes for off-shore development that assured delivery of high quality work. IBM represented that these processes employed IBM's existing, structured management systems, global delivery methodology, and development tools and templates, which IBM used to consistently achieve high quality on-site and off-shore development of the critical components of the IBM integration solution, which IBM committed to deliver. (Am. Compl. at ¶¶36-37; Ex. A, pp. 18-27).

In reliance on these and other representations, BSAM contracted with IBM for the services to evaluate the existing Commercial design for application to all BATO operations. In May 2009, IBM represented that its design could be scaled for all BATO operations. In reliance on IBM's representation, BSAM contracted with IBM to perform the next design phase, Common Design, in preparation for implementation of IBM's SAP OTC design solution for all divisions of BATO. Relying on IBM's continuing representations, in the fall of 2009, BSAM negotiated with IBM to provide the services to finalize and implement the core of the IBM design solution for BSAM. These negotiations culminated in the IBM December 18, 2009, SOW for SAP Order to Cash (OTC) All Division Rollout Project. ("December 2009 SOW") (Am. Compl. at ¶¶54-61).

The December 2009 SOW had two phases, Phase I, Design Completion, and Phase II, Implementation. Phase I took longer than expected, but BSAM shared responsibility for this Project impact, and in late 2010, the parties agreed to project scope changes and a new scheduled go-live date of October 1, 2011. (Am Compl. at ¶66). Phase II, utilizing IBM's design,

commenced in January 2011. IBM's performance of its sole contract responsibilities immediately started falling behind schedule because key IBM experts left the Project for reasons known only to IBM. BSAM requested replacements and additional IBM personnel, which were not forthcoming. (*Id.* at ¶¶67-68).

BSAM requested an assessment of IBM's integration solution and development work on IBM's recommended proprietary WPS middleware, which took place in May 2011. (*Id.* at ¶¶70-76). Following its assessment, IBM represented to BSAM that no major issues were found with IBM's work. IBM put primary responsibility for project delays and difficulties on BSAM. (*Id.* at ¶¶70-71, 74-75).

According to Plaintiff, the reports IBM gave to BSAM contained half-truths, were grossly incomplete, and concealed material facts internally reported by IBM including (1) the lack of critical IBM personnel skill sets required; (2) total disregard of IBM's own project management and development methodologies; and (3) failure of IBM developers to use available configurations and required tools. IBM intentionally painted a false picture of the quality of its services during critical contract negotiations on the PCR No. 8, in which IBM obtained terms BSAM would not have otherwise agreed had it known the truth. (*Id.* at ¶¶71, 72, 74-75, 77-78, 98-99).

Following IBM's false assessment, the Project focused on IBM's rework of WPS interfaces and topology. IBM reorganized its development teams, purportedly working to meet the October 1 Go-Live, but in mid-August IBM conceded the October 1 Go-Live was not possible. (*Id.* at ¶79). Go-Live was delayed to January 3, 2012, with all parties understanding BSAM business requirements meant this date had to be met. (*Id.* at ¶80). On December 27, 2011, after cutover to the new system was well underway, IBM project leadership returned from

holiday and recommended that Go-Live be cancelled based on specific risks IBM had identified early in December. These risks were typical Go-Live risks, which were either acceptable to BSAM, or for which mitigation plans had been developed and put into place. Cancelling Go-Live was not feasible. (*Id.* at ¶¶82-83). The real risks, resulting in the SAP OTC system being totally overwhelmed and initially rendered useless, were known to IBM, but concealed from BSAM.

Go-Live was catastrophic. System failures and errors were exponentially greater than what should be expected from the risks IBM had disclosed. IBM's design and implementation malfunctioned in almost every area, making it impossible for BSAM to reliably process orders, ship product, track product, determine inventory, or perform normal business accounting functions. (*Id.* at ¶¶84-87). Despite BSAM's commitment of all available IT resources and engagement of SAP and Fujitsu to assist IBM, orders could not be processed and delivered. BSAM executives met nightly to "save January" while IBM blamed BSAM. (*Id.* at ¶¶86-93).

Six months later, the IBM solution design system continued to be unreliable. A host of fundamental system defects and flaws were still being dealt with when IBM left the Project in 2012. After paying IBM $78 million for its services, BSAM had to pay millions to other IT service providers for additional work on a substandard system. (*Id*. at ¶¶94-96).

## ANALYSIS

According to Plaintiff, BSAM has learned that IBM knew early in the Project that IBM (1) was not providing qualified personnel; (2) never applied its project management and quality control procedures to its own work in time to deliver the quality represented; (3) did not utilize the methodologies and tools represented as standard for its work on the Project; and (4) did not manage or disclose the risks it injected into the Project as promised and agreed upon—all putting

the SAP OTC Project on the highway to the disaster that manifested during go-live. And now, according to Plaintiff, IBM insists that it was just there to work by the hour, do only what it was told, and collect its over $78 million in hourly fees, bearing no responsibility for the damages to BSAM caused by IBM's material breach of fundamental common law and contractual duties attached to its services.

IBM asks the Court to dismiss BSAM's five non-contract claims as legally invalid, and to dismiss all claims as improperly pled. First, the misrepresentation-based counts (I-III) should be dismissed because BSAM cannot evade written promises not to rely on extra-contractual representations, and because IBM had no extra-contractual duty to disclose. Second, BSAM, despite its amendments, still has not pled facts sufficient to state a claim under the Tennessee Consumer Protection Act (IV). Third, BSAM's constructive fraud claim (III) does not and cannot plead the requisite legal or equitable duty necessary to state a claim. Next, the contract claim (VI) remains insufficiently pleaded; BSAM still nowhere adequately identifies which provisions of which contracts were breached.[3] Finally, each count (I-VI) should be dismissed to the extent it seeks recovery for the remaining non-party corporate affiliate that allegedly assigned claims to BSAM. This non-party was not a third-party beneficiary of the contracts between BSAM and IBM, and BSAM again fails to allege the noncontract claims that this non-party supposedly assigned to it. *See* (Docket Entry No. 143 at 1-2).

## I.    Standard of Review

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must take "all well-pleaded material allegations of the pleadings" as true. *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). The factual allegations in the

---

[3] Defendant's motion to dismiss does not challenge BSAM's gross negligence claim (Count V). Hence, this claim will survive the instant motion.

complaint "need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009)). " 'A legal conclusion couched as a factual allegation,' " however, "need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient." *Id*. (quoting *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)). Further, in determining whether a complaint sets forth a plausible claim, a court may consider not only the allegations, but "may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." *Ley v. Visteon Corp.*, 543 F.3d 801, 805 (6th Cir. 2008) (citation omitted).

A higher pleading standard applies to claims of fraud. *Schmidt v. Martin,* 2005 WL 2100645, *2 (W.D.Tenn. Aug.19, 2005). When alleging fraud, "a party must state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b). This requires allegations about "the time, place, and content of the alleged misrepresentation ...; the fraudulent intent of the defendants; and the injury resulting from the fraud." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.,* 532 F.3d 496, 504 (6th Cir. 2008) (citation omitted). Rule 9(b), however, "should be interpreted in harmony with Rule 8's statement that a complaint must only provide 'a short and plain statement of the claim' made by 'simple, concise, and direct allegations.' " *Id.* at 503. The key consideration is whether the complaint gives the defendant "fair notice" of the fraud claim and enables the defendant to prepare a responsive pleading. *Id.* at 504.

## II.     Application of Law

### A. Misrepresentation-Based Claims (Counts I-III)

Plaintiff has brought claims for fraud in the inducement (Count I), misrepresentation in business transactions (Count II), and constructive fraud (Count III).  According to Defendant, Plaintiff "tells its fraud story in two strands" – the first piece being that IBM made affirmative misrepresentations to BSAM in the negotiation of certain contracts and the second being tortious omission of information about the progress and risks of the project.  (Docket Entry No. 144 at 8). Defendant argue these claims should be dismissed because "the contracts negate the element of reasonable reliance and because IBM had no tort-based duty to disclose[] the misrepresentation-based claims."  (*Id.*).[4]

Under Tennessee law, a plaintiff must prove five elements to sustain a claim of fraud in the inducement of a contract:

> (1) [the existence of] a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; (5) an injury resulting from the reliance.

*Blackburn & McCune, PLLC v. Pre–Paid Legal Servs., Inc.,* No. M2009–01584–COA–R3–CV, 2010 WL 2670816, at *11 (Tenn.Ct.App. June 30, 2010) (quoting *Lamb v. MegaFlight, Inc.,* 26 S.W.3d 627, 630 (Tenn.Ct.App. 2000)).

Regarding the tort of negligent misrepresentation, Tennessee has adopted the definition found in the Restatement (Second) of Torts § 552, which strictly limits the tort to "commercial" or "business" transactions. *Hodge v. Craig,* 382 S.W.3d 325, 344-45 (Tenn. 2012); *Robinson v.*

---

[4] The Court notes that the only elements contested in the misrepresentation claims are that of reliance and omission.

*Omer,* 952 S.W.2d 423, 427 (Tenn. 1997); Restatement (Second) of Torts § 552(1) & cmt. a. Tennessee's formulation of the tort creates liability only when:

> (1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and (2) the defendant supplies faulty information meant to guide others in their business transactions; and (3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff justifiably relies upon the information.

*Thompson v. Bank of America*, 773 F.3d 741, 752 (6th Cir. 2014) (citing *Robinson,* 952 S.W.2d at 427 (quoting *John Martin Co. v. Morse/Diesel, Inc.,* 819 S.W.2d 428, 431 (Tenn. 1991)).

A plaintiff asserting a claim for fraud under Tennessee law must show the following six elements:

> (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied upon the misrepresented fact; and (6) plaintiff suffered damage as a result of the misrepresentation.

*PNC Multi–Family Capital Institutional Fund v. Bluff City Community Development Corp.,* 387 S.W.3d 525, 548 (Tenn.Ct.App. 2012). With regard to Plaintiff's proposed claim for constructive fraud, constructive fraud "is essentially fraud without the element of intent." *Kincaid v. SouthTrust Bank,* 221 S.W.3d 32, 39 (Tenn.Ct.App. 2006).

> Constructive fraud is a breach of a legal or equitable duty which is deemed fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Constructive frauds are acts, statements or omissions which operate as virtual fraud on individuals. They concern a breach of a legal or equitable duty, with or without fraudulent intent, and entail as an attribute of fraud, conduct which reasonably can be expected to influence the conduct of others.... Constructive fraud is essentially fraud without the element of

intent. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud.

*Kincaid v. SouthTrust Bank,* 221 S.W.3d 32, 39–40 (Tenn.Ct.App. 2006) (internal citations omitted).

[A] confidential relationship is any relationship which gives a person dominion and control over another. It is not merely a relationship of mutual trust and confidence, but rather a confidential relationship is one where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to exercise dominion and control over the weaker or dominated party. A confidential relationship is created when one person has dominion and control over another.

*Rogers v. The First Nat'l Bank,* No. M2004–02414–COA–R3–CV, 2006 WL 344759, at *8 (Tenn.Ct.App. Feb.14, 2006) (internal citations omitted); *see also Thompson v. Am. Gen. Life & Accident Ins. Co.,* 404 F.Supp.2d 1023, 1028 (M.D.Tenn. 2005) ("Fiduciary relationships may arise whenever confidence is reposed by one party in another who exercises dominion and influence. A fiduciary duty is the duty to act primarily for another's benefit.")(citations omitted).[5]

### i. Reliance

First, Defendant argues that Counts I-III require Plaintiff to plausibly allege reliance and the alleged misrepresentations, but Plaintiff cannot do so. (Docket Entry No. 144 at 9). According to Defendant, Plaintiff "repeatedly and expressly *promised that it was not relying* on any representation not specified in the contracts." (*Id.*) (emphasis in original). Further, Defendant expounds,

---

[5] In addition to Defendant's arguments surrounding reliance and omission, Defendant contends Plaintiff's constructive fraud claim cannot survive because it lacks facts, which show a confidential relationship that would give rise to the legal or equitable duty required for this claim. Defendant further argues, "[i]f the relationship between BSAM and IBM qualifies for the imposition of the requisite duty, it is difficult to imagine one that would not, which would essentially eliminate the intent element for fraud claims brought under Tennessee law." (Docket Entry No. 144 at 21-22). After an exhaustive review of the Amended Complaint, the Court finds that no facts exist to support a confidential relationship with BSAM and IBM; thus, Plaintiff's claim for constructive fraud fails.

First, BSAM signed contracts with integration clauses, including not only the umbrella January 2009 MSA but also dozens of PCRs signed throughout the projects and after go-live.6 Further, BSAM explicitly memorialized its lack of reliance in several contracts, including this promise that appeared just above the signature lines in the Rollout Project SOW:

> "This SOW and the referenced Agreement identified below, are the complete agreement between BSAM and IBM regarding Services, and replace any prior oral or written communications between us. Accordingly, in entering into this SOW, ***neither party is relying upon any representation that is not specified in this SOW including without limitation, any representations concerning 1) estimated completion dates, hours, or charges to provide any Service; 2) the experiences of other customers; or 3) results or savings BSAM may achieve.***"

> Ex. C, § 1.9 (emphasis added).

***

Tennessee cases suggesting hesitation to enforce such clauses are distinguishable because they involve relatively unsophisticated parties agreeing to less specific provisions. *See, e.g., First Nat'l Bank of Louisville v. Brooks Farms*, 821 S.W.2d 925 (Tenn. 1991) (not giving preclusive effect to disclaimers in purchase orders signed by a group of dairy farmers). BSAM's claim is at the opposite end of the spectrum from cases like *Brooks Farms*, where the nonreliance clause at issue was buried in a purchase order signed by dairy farmers who "had no direct contact" with the defendant manufacturer, which was part of a large public company. *See First Nat'l Bank of Louisville v. Brooks Farms*, No. 89-194, 1990 WL 6386, at *3-4 (Tenn. Ct. App. June 25, 1990) (appellate decision describing facts at issue). Here, the parties' contracts were not pre-printed, take-it-or-leave-it purchase orders; nor was there any imbalance in negotiating power. *See supra* II.A-B (describing parties and their contracts). In contrast, two multinational corporations, represented by sophisticated counsel, negotiated at arm's length a series of contracts that carefully allocated risk among the parties.10 The parties' final bargains included a series of integration and non-reliance clauses. They should be given effect.

(*Id*. at 9-10).

Plaintiff argues that Defendant "challenges one element – reliance of BSAM's misrepresentation claims with a purely legal argument: That a clause in the December 2009

SOW . . . is a contractual bar to proof of reliance, defeating all misrepresentation claims."

(Docket Entry No. 149-1 at 8).  However, Plaintiff counters,

> IBM never explains how the alleged contractual waiver in the MSA or SOW can waive future claims based on IBM misrepresentations made subsequent to the execution of the SOW to induce BSAM (1) to continue paying for IBM hourly services, (2) to extend the Project to allow IBM to attempt to cover its material contract breaches and gross negligence, (3) to execute PCRs8 BSAM would not have otherwise executed, and (4) to make Project decisions BSAM would not have otherwise made. As the Complaint demonstrates, these post-SOW misrepresentations are central to the case, making IBM's "reliance" argument vacuous.

> For instance, the Complaint specifically alleges IBM made material misrepresentations *during the Project,* including misrepresentations that BSAM was primarily responsible for IBM Project delays and failures, when IBM knew its own material failures to staff the Project with qualified personnel, follow its own management practices and methodologies, and other breaches of duty were material causes, or the sole proximate causes of these Project changes. Throughout the Project, IBM represented to BSAM that there were no fundamental flaws in its work and blamed BSAM while concealing its findings regarding its own major breaches. IBM, long after the SOW was signed, intentionally misrepresented and concealed material facts related to its performance on the Project (*See* Compl. ¶¶ 68, 70-72, 74-78, 98, 99, 102, 106) for the purpose of inducing BSAM to continue dealing with IBM, to continue with the OTC Project, and the payment of hourly fees. Such misrepresentation and concealment totally misled BSAM regarding the risks of Go-Live, which would not have proceeded had BSAM known the truth.

***

> IBM's argument that BSAM contractually waived the reliance element of its misrepresentation claims is also precluded under Tennessee law. IBM's argument relies exclusively on various versions of boilerplate contained in a paragraph above the signature lines in the IBM SOW and some PCRs, sometimes titled "Signature Acceptance." The issue, then, is whether the language "*neither party is relying upon any representation that is not specified in this SOW*" or similar variants are sufficient to defeat BSAM's claim that IBM's contract documents directly related to the SAP OTC Project were fraudulently induced. IBM's argument has been rejected by the Tennessee Supreme Court and other state and federal courts.

***

> The law of Tennessee is clear – a disclaimer has no effect in the presence of fraud – and IBM's argument is thus without merit.

(*Id*.).  Here, the central issues contested by Defendant are whether Plaintiff plausibly alleges Defendant misrepresented material facts and whether Plaintiff plausibly alleges it justifiably relied upon Defendant's misrepresentations. Plaintiff has sufficiently pleaded both.  The Court finds that Plaintiff's allegations taken as true are plausible.

### ii. Omission

Second, Defendant argues that Plaintiff's misrepresentation claims rely profoundly on purported omissions to "prop up its non-contract claims," but IBM was under no such duty to disclose – and as such – to the extent they are based on alleged omissions, the claims should be dismissed.  (Docket Entry No. 144 at 12).

In Tennessee, "'the tort of fraudulent concealment is committed when a party who has a duty to disclose a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury.'" *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 571 (6th Cir. 2003) (quoting *Chrisman v. Hill Home Dev., Inc*. 978 S.W.2d 535, 538-39 (Tenn. 1998)).

Although the parties disagree as to which cases apply to these facts, the parties are correct in that there are two lines of Tennessee cases regarding a party's duty to disclose information. *Domestic Sewing*, a 1885 Tennessee Supreme Court decision, held that a duty to disclose arises only in three "distinct" circumstances: (1) "where there is a previous definite fiduciary relation between the parties," (2) "where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other," and (3) "where the contract or transaction is intrinsically fiduciary and calls for perfect good faith." *Domestic Sewing Mach. Co. v. Jackson*, 83 Tenn. 418, 425 (1885).  The Sixth Circuit adopted the *Domestic Sewing* formulation in *Shah*.

338 F.3d at 571.[6]  The parties agree that Plaintiff's relationship with Defendant does not fall into any of these three categories.

There is a competing line of Tennessee cases, originating with *Simmons v. Evans*, 206 S.W.2d 295 (Tenn. 1947).  *Simmons* held that "each party to a contract is bound to disclose to the other all he may know respecting the subject matter materially affecting a correct view of it."  *Id.* at 296.  The Tennessee Court of Appeals reaffirmed this principle, stating that "contracting parties have a duty to disclose material facts affecting the essence of a contract's subject matter."  *Odom v. Oliver,* No. W2008–01145–COA–R3–CV, 2009 WL 691879, at *4, 2009 Tenn.App. LEXIS 103, at *11 (Tenn.Ct.App. Mar. 17, 2009); *see also Lonning v. Jim Walter Homes, Inc.,* 725 S.W.2d 682, 685 (Tenn.Ct.App. 1986) (same); *Patel v. Bayliff,* 121 S.W.3d 347, 353 (Tenn.Ct.App. 2003) ("[A] seller has a duty to disclose 'a fact of controlling importance in determining the desirability and value of that residence ....' "); *Garrett v. Mazda Motors of America,* 844 S.W.2d 178, 181 (Tenn.Ct.App. 1992) ("[A] seller who induces a purchaser to buy an article of property by ... concealing a material fact is liable for the damages that are the natural and proximate result of the fraud.").  "This concept goes back almost 200 years" in Tennessee's

---

[6] In *Shah*, the Sixth Circuit explained its decision to not apply the *Simmons* line of cases by noting that "these cases have generally been limited to real estate purchases and used car sales." 338 F.3d at 572 n.9 (citations omitted). *Shah* involved a dispute between plaintiff gas station franchisees and the defendant franchisor. The plaintiffs bought an interest in a gas station lease from the previous franchisee after the defendant assured them that, as long as the gas station was performing well, the defendant would not invoke a 30-day termination clause contained in the lease. *Id.* at 561, 563-65. Soon after, however, the defendant sold the gas station and terminated the lease. *Id.* at 565. The defendant had no duty to disclose its intention to sell the station because the court "decline[d] to anticipate that the Tennessee Supreme Court would extend [*Simmons*] to the context of a franchise dispute." *Id.* at 572 n.9.

But since *Shah* was decided in 2003, Tennessee courts have repeatedly applied *Simmons* in contexts other than car and real estate sales. *See Guesthouse*, 2010 Tenn. App. LEXIS 206, at *82-87; *Consumer Fin. Servs. (Mgmt.) v. Consumer Fin. Servs. Mgmt., L.L.C.*, No. M2003-02030-COA-R3-CV, 2005 Tenn. App. LEXIS 774 (Tenn. Ct. App. Dec. 9, 2005) (applying *Simmons* to a transaction involving the sale of a business); *see also Body Invest, LLC v. Cone Solvents, Inc.*, No. M2006-01723-COA-R3-CV, 2007 Tenn. App. LEXIS 480, at *16, 24 (Tenn. Ct. App. July 26, 2007) (allowing a fraudulent concealment claim to go forward when the parties were not in a fiduciary relationship; the defendant sold contaminated chemicals to the plaintiff, a tanning products manufacturer).

jurisprudence. *Bradley v. All Am. Classics of Tenn., Inc.,* No. M2008-01738-COA-R3-CV, 2009 WL 1034797, at *4, 2009 Tenn.App. LEXIS 138, at *10 (Tenn.Ct.App. Apr. 16, 2009) (citing *Perkins v. M'Gavock,* 3 Tenn. 415, 417 (1813)).

The Tennessee Court of Appeals has since expanded upon *Simmons*'s formulation. In *Patton v. McHone*, 822 S.W.2d 608 (Tenn. Ct. App. 1991), the court relied on *Simmons* and sections 551 and 552 of the Restatement (Second) of Torts in stating that, even "in the absence of a special relationship," a seller must disclose material information about its product in certain circumstances. *Id.* at 615. Specifically:

> (1) a seller must disclose enough information to prevent its statements from being misleading;
>
> (2) a seller must give accurate answers to a buyer's questions concerning a product's condition;
>
> (3) a seller must disclose any condition or defect that it knows or should know about that renders the product defective or dangerous; and
>
> (4) a seller must disclose basic, material information if it knows that the buyer is about to act without knowledge of the information and is without reasonable means to acquire the information itself.

*Id.* at 615-16 (footnotes omitted).[7]

After reviewing the applicable case law, the Court finds that the *Simmons* line of cases applies to the present case – and further finds that Plaintiff's allegations taken as true are plausible. Plaintiff contends it had no knowledge that Defendant was concealing this information, and it relied on Defendant's representations to its detriment. In particular, Plaintiff alleges specifics showing that IBM both concealed material facts regarding management and

---

[7] The Tennessee Court of Appeals has reaffirmed the validity of *Simmons*. *Guesthouse Int'l, LLC v. Shoney's N. Am. Corp.*, No. M2008-02567-COA-R3-CV, 2010 Tenn. App. LEXIS 206, at *79-80 (Tenn. Ct. App. Mar. 18, 2010); *see also Goodall v. Akers*, No. M2008-01608-COA-R3-CV, 2009 Tenn. App. LEXIS 294, at *23 n.6 (Tenn. Ct. App. Mar. 3, 2009) (noting that "[s]everal of the Tennessee cases on fraudulent concealment cite with approval § 551(1) of the Restatement (Second) of Torts").

performance of its services, causing major defects in its work; and had BSAM known the facts concealed by IBM, it would not have pursued and continued to pursue the Project under contract with IBM as it did, nor would it have gone live when it did.  *See* (Amend. Compl. ¶¶98-102, 106.)

Construing the allegations of the Complaint in the light most favorable to Plaintiff, the Court finds it has sufficiently established the required elements for fraud in the inducement (Count I), misrepresentation in business transactions (Count II) – but has failed to meet the burden for its constructive fraud claim (Count III).  Therefore, Plaintiff's claims for fraud in the inducement and misrepresentation in business transactions will survive; the constructive fraud claim will be dismissed.

## B. The TCPA Claims (Count IV)

Defendant further argues that Plaintiff's TCPA claim as set forth in Count IV is subject to dismissal because the Complaint does not adequately allege conduct that fits any of the TCPA provisions with the requisite particularity.

The TCPA prohibits the use of "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn.Code Ann. § 47–18–104(a). Therefore, a plaintiff pleading a TCPA claim is generally considered to have the burden to plead an "unfair or deceptive" act or practice and that such conduct caused an "ascertainable" loss. *See Tucker v. Sierra Builders,* 180 S.W.3d 109, 115 (Tenn.Ct.App. 2005). An "unfair or deceptive" act or practice is a "material representation, practice or omission likely to mislead a reasonable consumer." *Ganzevoort v. Russell,* 949 S.W.2d 293, 299 (Tenn.1997).

To make out a claim under the TCPA, a plaintiff must establish: (1) an ascertainable loss of money or property; (2) that such loss resulted from an unfair or deceptive act or practice; and (3) that the act or practice is declared unlawful under the TCPA. Tenn.Code Ann. § 47–18–109. Although the TCPA imposes no single standard to determine whether an act or practice is

deceptive, the Tennessee Supreme Court has described a deceptive act or practice as " 'a material representation, practice, or omission likely to mislead ... reasonable consumers' to their detriment." *Fayne v. Vincent,* 301 S.W.3d 162, 177 (Tenn.2009) (quoting *Ganzevoort v. Russell,* 949 S.W.2d 293, 299 (Tenn. 1997) (quoting *Bisson v. Ward,* 160 Vt. 343, 628 A.2d 1256, 1261 (1993))).

Defendant is correct in that TCPA claims are subject to the higher pleading standard articulated in Rule 9(b). *Parris v. Regions Bank,* No. 09–2462, 2011 WL 3629218, at *8 (W.D.Tenn. Aug.17, 2011); *accord Metro. Prop. & Cas. Ins. Co. v. Bell,* No. 04–5965, 2005 WL 1993446, at *5 (6th Cir. Aug.17, 2005); *cf. Glanton v. Bob Parks Realty,* No. M2003–01144–COA–R3–CV, 2005 WL 1021559, at *6 (Tenn.Ct.App. April 27, 2004) (citing *Harvey v. Ford Motor Credit Co.,* 8 S.W.3d 273, 275 (Tenn.Ct.App. 1999)). Accordingly, Plaintiff must "set forth specific fraudulent or deceptive acts rather than general allegations." *AGFA Photo USA Corp. v. Parham,* No. 1:06–cv–216, 2007 WL 1655891, at *11 (E.D.Tenn. June 5, 2007).

Recognizing that there is a heightened standard for pleading claims under the TCPA, the Court finds that the Amended Complaint does sufficiently state a claim under the TCPA. Plaintiff has pleaded plausible, albeit somewhat strained, facts to survive its allegations that Defendant engaged in unfair and deceptive acts and practices violating §§ 47-18-104(b)(3), (5), (7), (11), (13) and (21) and that BSAM suffered damages as a result. Accordingly, Plaintiff will survive Defendant's motion to dismiss on the TCPA claim (Count IV).

### D. Breach of Contract Claim (Count VI)

In the context of a motion to dismiss, a breach of contract claim must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery. *Twombly,* 550 U.S. at 562, 127 S.Ct. 1955 (2007). To establish a breach of contract, a plaintiff

must show "(1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by the breached contract." *Nw. Tenn. Motorsports Park, LLC v. Tenn. Asphalt Co.,* —— S.W.3d ——, ——, 2011 WL 4416561, at *5 (Tenn.Ct.App. Sept. 23, 2011) (internal quotation marks omitted). The interpretation of a contract is a legal issue for the Court. *First Am. Nat'l Bank v. Fidelity & Deposit Co. of Md.,* 5 F.3d 982, 984 (6th Cir.1993).

Defendant argues that Plaintiff's claim for breach of contract should be dismissed because Plaintiff fails to specify which contractual provisions that Defendant has breached. (Docket Entry No. 144 at 22). Specifically, Defendant contends "Plaintiff lists a number of agreements, including fifteen SOWs, many of which are alleged to include an unspecified number of PCRs" – but "fails to specify the contractual provisions it claims IBM breached." (Id. at 23). Plaintiff counters that its Complaint "identities the specific contracts and duties at issue . . .alleges facts supporting the intentional, reckless, and material breach of duties … [and] alleges that its damages were proximately caused by [those] breaches." (Docket Entry No. 149-1 at 25). Defendant purports, however, that this simply is not enough and the breach of contract claim is inadequately pled. (Docket Entry No. 153 at 9). And the two cases cited by Plaintiff[8] recite the bare elements of a breach of contract claim, with which "IBM does not quarrel." (Docket Entry No. 153 at 9, fn 12). But they fail to support Plaintiff's position that "it can put more than a dozen groups of contracts at issue without even informing IBM what provisions it alleges IBM breached." (*Id.*).

---

[8] *See, e.g., Kerns v. Caterpillar, Inc.*, 583 F. Supp. 2d 885, 901 (M.D. Tenn. 2008) (party asserting breach of contract need only plead the existence of a contract, a breach of contract, and resulting damages); *Pureworks, Inc. v. Brady Corp.*, No. 3:09-cv-983, 2010 U.S. Dist. LEXIS 97688, *41 (M.D. Tenn. Sept. 15, 2010) (accepting well-pleaded factual assertions and construing complaint liberally in favor of plaintiff, motion to dismiss denied).

Plaintiff's First Amended Complaint asserts breach of contract, and alleges, in pertinent part:

## COUNT VI
## BREACH OF CONTRACT

146. Pursuant to Fed. R. Civ. Pro. 10(c), BSAM incorporates the allegations contained in paragraphs 1 – 145, inclusive, into this Count IV.

147. Both parties have access to the contracts that were breached by IBM. The specific contracts which are the subject of this dispute are:

a.      August 3, 2009 – Project Change Request 7, Current Production Systems (CPS), eBusiness, & Business Intelligence AMS Project and all subsequent PCRs;

b.      March 30, 2010 – AMS, eBusiness Conversion & Interface to SAP Project Statement of Work;

     i.      All subsequent PCRs to the AMS, eBusiness Conversion & Interface to SAP Project Statement of Work;

c.      November 22, 2010 – BI/BW Business Analyst Services Statement of Work;

     i.      All subsequent PCRs to the BI/BW Business Analyst Services Statement of Work;

d.      June 22, 2011 – Schedule 3 OTC-Related Application Management Services Statement of Work for BSAH;

     i.      All subsequent PCRs to Schedule 3 OTC-Related Application Management Services Statement of Work for BSAH;

e.      January 9, 2009 – Master Services Agreement By and Between Bridgestone Americas Holding, Inc. and International Business Machines Corporation;

     i.      February 27, 2009 – Statement of Work for SAP Order to Cash (OTC) Enterprise Design and Roadmap;

     ii.      June 3, 2009 – Bridgestone Americas (BSAM) SAP Order-to-Cash (OTC) Common Design Project – Project Preparation Phase;

     iii.      June 30, 2009 – Statement of Work for SAP Order to Cash (OTC)

Common Design Phase 0.2;

iv.     September 18, 2009 – Statement of Work for Transportation Management System (TMS) Early Release Project Planning & Design Phase;

      a.    All subsequent PCRs to the Statement of Work for Transportation Management System (TMS) Early Release Project Planning & Design Phase;

v.      December 1, 2009 – Statement of Work for Warehouse Management System (WMS) Project Planning Phase;

vi.     December 17, 2009 – Statement of Work for Transportation Management System (TMS) Early Release January Staff Augmentation;

vii.    December 17, 2009 – Statement of Work for Warehouse Management

viii.   December 21, 2009 – Statement of Work for SAP Order to Cash (OTC) All Division Rollout Project;

      a.    All subsequent PCRs to the Statement of Work for SAP Order to Cash (OTC) All Division Rollout Project;

ix.     January 28, 2010 – Statement of Work for Transportation Management System (TMS) Early Release Project Execution Phase;

      a.    All subsequent PCRs to the Statement of Work for Transportation Management System (TMS) Early Release Project Execution Phase;

x.      January 29, 2010 – Statement of Work for Warehouse Management System (WMS) Project Planning Phase;

      a.    All subsequent PCRs to the Statement of Work for Warehouse Management System (WMS) Project Planning Phase;

xi.     June 11, 2010 – Statement of Work for OTC Warehouse Management System (OTC WMS) All Division Rollout Project;

      a.    All subsequent PCRs to the Statement of Work for OTC Warehouse Management System (OTC WMS) All Division

Rollout Project;

xii.     September 1, 2010 – Statement of Work for Transportation
         Management System (TMS) OTC Integration & Event
         Management Staff Augmentation;

         a.     All subsequent PCRs to the Statement of Work for
                Transportation
                Management System (TMS) OTC Integration & Event
                Management Staff Augmentation.

Among other cases, Defendant relies on language from a Report and Recommendation,

which this Court adopted in the case of *Paz v. Wells Fargo*, No. 3:11-cv-0419, 2012 WL

6623082, at *3 (M.D. Tenn. Dec. 19, 2012), which states,

> The Court cannot discern any terms of the alleged contract between Plaintiff
> and Defendants, nor can the Court discern what provisions are allegedly breached,
> how Defendants allegedly breached those provisions, or what damages Plaintiff
> has suffered as a result of the alleged breach. Accordingly, Plaintiff's allegations
> fail to state a claim upon which relief can be granted.

Unlike the case at hand, in *Paz*, the plaintiff not only failed to provide specific provisions to the

contract, he failed to identify *any* contract between him and the bank – and therefore, failed to

demonstrate and enforceable agreement even existed among the parties. Admittedly, if the

factual record fails to narrow the specific contractual provisions allegedly breached, it is doubtful

Plaintiff's breach of contract claim will survive a motion for summary judgment. Nonetheless,

unlike *Paz*, Plaintiff has adequately pled a claim for breach of contract at this stage in the

litigation. Plaintiff directly alleges the existence of valid contracts (which are attached as

exhibits to the Complaint) with IBM, adequately alleges non-performance, and directly alleges

damages as a result of IBM's breach. The Court finds that Plaintiff has fulfilled the pleadings

requirement for its breach of contract claim. Accordingly, the Court will not dismiss Plaintiff's

breach of contract claim (Count VI).

**E. Claims for BATO**

Defendant argues that Plaintiff's claims on behalf of BSAM North American Tire Operations ("BATO") should be dismissed. According to Defendant,

> BATO, a distinct corporate entity, allegedly "assigned" to BSAM "all claims and rights" it has against IBM. Am. Compl. ¶¶ 20-21. Even assuming the validity of that assignment for the purpose of this motion, the complaint as amended still does not adequately allege that BATO had any claims to assign. *See Binswanger Southern (N.C.), Inc. v. Textron, Inc.*, 860 S.W.2d 862, 865-66 (Tenn. App. Ct. 1993) (holding that because an assignee of a chose in action steps into the shoes of its assignor, where the assignor "does not have shoes, [the assignee] has nothing to step into").

***

> BSAM alleges that BATO assigned to BSAM its rights to recover as a third-party beneficiary under contracts to which it is not a party. Am. Compl. ¶ 21. But contracts are generally presumed to be "executed for the benefit of the parties thereto and not third persons." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Concord EFS, Inc.*, 59 S.W.3d 63, 68 (Tenn. 2001) (*quoting Oman Constr. Co. v. Tenn. Cent. Ry. Co.*, 370 S.W.2d 563, 572 (Tenn. 1963)). Only intended and not incidental beneficiaries may enforce a contract. *Id.* A third party is an intended beneficiary only if "(1) ***The parties to the contract have not otherwise agreed;*** (2) Recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties; ***and*** (3) The terms of the contract or the circumstances surrounding performance indicate that either: (a) the performance of the promise will satisfy an obligation or discharge a duty owed by the promissee to the beneficiary; or (b) the promise intends to give the beneficiary the benefit of the promised performance." *Id.* at 70 (emphasis added).

> Courts "honor any expression of intent by the parties to reserve to themselves the benefits of the contract." *Id.* The January 2009 MSA states that "[e]xcept as ***expressly*** set forth in this Agreement or a Statement of Work hereto, no third party beneficiary rights are intended to be created under this Agreement." Ex. A, § 23.3 (emphasis added). Even absent that provision, BSAM has not plausibly pled third-party beneficiary rights on behalf of BATO. Rather, it alleges that "[r]ecognizing BATO and BSRO as third party beneficiaries is appropriate to effectuate the parties' intent in the SAP OTC contracts and the SOWs and PCRs relating to the SAP OTC project." Am. Compl. ¶ 21. It also avers that "[t]he terms of those contracts and the circumstances indicate that performance of those contracts by IBM satisfied contractual obligations it owed to BATO" without stating to what "terms" or "contractual obligations" it refers. *Id.* Those conclusory allegations are insufficient. BSAM thus has not plausibly alleged satisfaction of

the test for discerning intended third-party beneficiaries. Given that it didn't even try to do so in its Amended Complaint, nor can it.

Because otherwise it would have no shoes into which to step, assignee BSAM must adequately allege claims on behalf of assignor BATO. *See Binswanger Southern*, 860 S.W.2d 862 at 866-67. BSAM attempts to do this in one move: "Unless otherwise expressly stated, facts asserted on behalf of BSAM include all relevant aspects of the rights and claims of BATO." Am. Compl. ¶ 21.

\*\*\*

It is even more clearly inadequate for the misrepresentation-based counts (I-IV), which are subject to Rule 9(b)'s requirement that a party state "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

\*\*\*

BSAM cannot evade the federal pleadings standards by simply alleging an "assignment."

(Docket Entry No. 144 at 24-26). Plaintiff avers, however, its claims for BATO are properly

pleaded in the Complaint, contending,

But the MSA, itself, defeats this argument. Section 1 of the MSA titled "INTERPRETATION," contains "Definitions" which define BSAH Group [BSAM Group] as BSAM and all "Affiliates" it controls. (IBM Motion Ex. A., 1.1 Definitions.) "Affiliate" is defined as to include BATO as a controlled entity. (*Id.*) Paragraph 1.5 within the Interpretation Section reads in pertinent part as follows:

*all references herein to BSAH will be construed to include the applicable BSAH Group Members receiving or paying for Services*, in each case *whenever the context so requires*.

(*Id.* (emphasis added).) Likewise, the December 2009 SOW (IBM Motion Ex. C) expressly provides that the "Organizational Scope" of IBM's work under the SOW includes Consumer OEM and Consumer Replacement [BATO]. (IBM Motion Ex. C, § 1.1.2 Organizational Scope.)

In the context, BATO was an intended beneficiary of the contract. The damages claimed accrued within these two entities, and damages are alleged as to both parties. (*E.g.,* Compl. ¶¶ 21, 22, 24, 46, 53(b),(d), (f), 61, 106, 114, 121, 135, 145, 154.) To avoid a real party in interest issue, BATO assigned its rights to BSAM. This is not evading the federal rules; it is complying with them. IBM's argument is baseless.

Under Tennessee law, contracts are generally presumed to be executed for the benefit of the parties to the contract, not third parties. *Owner Operator Indep. Drivers Ass'n, Inc. v. Concord EFS, Inc.,* 59 S.W.3d 63, 68 (Tenn. 2001). Put another way, "a stranger to a contract has no right to sue for its breach, but an intended third-party beneficiary may enforce a contract provided the benefit flowing from the contract to that party was intended, not merely incidental." *Id.; Moore Constr. Co., Inc. v. Clarksville Dep't of Elec.,* 707 S.W.2d 1, 9 (Tenn.Ct.App. 1985); *see also Davidson & Jones Dev. Co. v. Elmore Dev. Inc., et. al,* 921 F.2d 1343 (6th Cir. 1991). In order to show that BATO is an intended third-party beneficiary, the Complaint must allege facts showing (1) the existence of a valid subcontract between Plaintiff and BATO; and (2) that the clear intent of the subcontract was to benefit BATO. *Bricks, Inc. v. BNY Trust Co. of Missouri*, 165 F.Supp.2d 723, 726-27 (W.D. Tenn. 2001)(citing *United Am. Bank of Memphis v. Gardner,* 706 S.W.2d 639, 641 (Tenn.Ct.App. 1985)). Construing the allegations in the light most favorable to Plaintiff, the Court finds that Plaintiff has pleaded enough factual matter to allege that BATO was a third-party beneficiary of the contract – and as such, BATO's breach of contract claim will survive for the reasons discussed *supra* as to BSAM's breach of contract claim.[9]

The foregoing rulings may be revisited in the context of a motion for summary judgment after the factual record has been developed. But for now, however, the Court finds that Plaintiff has alleged sufficient facts to make each of its legal claims plausible – with the exception of its claim for constructive fraud and BATO's non-contract claims.

---

[9] Plaintiff has failed to sufficiently plead facts regarding the non-contract claims (Counts I-V); therefore, those claims will be dismissed as to BATO.

## CONCLUSION

For all of the reasons stated, Defendant's *Renewed Motion to Dismiss Plaintiff's First Amended Complaint* (Docket Entry No. 143) will be granted in part and denied in part. The motion will be granted with respect to Plaintiff's constructive fraud claim and BATO's non-contract claims (Counts I-V), and denied as to the remaining claims.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE